NORINSBERG CORPORATION,
Petitioner,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; United States of
America, Respondents.

No. 93–1842.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1995.

Decided March 3, 1995.

Before WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Norinsberg Corporation ("Norinsberg" or "Corporation") seeks review of an order of the Secretary of the United States Department of Agriculture ("Secretary" or "Department"). Norinsberg contends that the Secretary's decision to revoke the Corporation's Perishable Agricultural Commodities Act ("PACA") license failed to weigh mitigating circumstances appropriately and was therefore arbitrary and capricious. Norinsberg also argues that the Administrative Law Judge ("ALJ") committed reversible error in denying the Corporation's request— under the Jencks Act, 18 U.S.C. § 3500 (1988)—for a document that had been prepared by one of the Secretary's testifying witnesses summarizing the Department's investigative file. We find no merit in petitioner's objections and deny the petition for review.

I. BACKGROUND

A. *Regulatory and Factual Background*

The PACA requires dealers in fresh fruits and vegetables to obtain a license from the Department. 7 U.S.C. §§ 499a(4), 499c (1988). The Act makes it unlawful for licensees to fail or refuse to make "full payment promptly"[1] when obtaining their wares, *id.* § 499b(4), and permits the Secretary to revoke the license of merchants found guilty of "flagrant or repeated violations."[2] *Id.* § 499h(a).

The Norinsberg Corporation became a PACA licensee in 1975, and at the time of the events involved here was in the business of supplying apples to supermarket chains. The Corporation was owned by the Norinsberg family, who also owned Cornwall Orchards—a PACA licensee—and the Vermont

Alexander J. Pires, Washington, DC, argued the cause and filed the briefs, for petitioner.

Stephen M. Reilly, Atty., Office of the General Counsel, U.S. Dept. of Agriculture, Washington, DC, argued the cause, for respondents. With him on the brief was James Michael Kelly, Associate Gen. Counsel, U.S. Dept. of Agriculture, Washington, DC. Raymond W. Fullerton, Washington, DC, entered an appearance.

1.  7 C.F.R. § 46.2(aa)(5) defines "full payment promptly" for produce purchases as "within 10 days after the day on which the produce is accepted."

2.  The Administrative Procedure Act ("APA"), 5 U.S.C. § 558(c) (1988), imposes the additional requirement that violations be "willful" before a sanction of revocation may be imposed.

Apple Company, which was not PACA-licensed.

In December 1990, the Bank of Boston took over the ailing Bank of Vermont and called loans outstanding to Cornwall Orchards and the Vermont Apple Company totaling about $4 million. To satisfy this debt, the Norinsberg family obtained a $2 million loan, and took the remainder of the money owed from the Norinsberg Corporation and family funds. The Corporation was left with limited operating capital.

From March 1991 through February 1992, Norinsberg purchased 46 lots of apples from 10 suppliers. With little cash on hand, the Corporation was unable to make "full payment promptly," *id.* § 499a(4), of about $424,000. In September 1992, the Director of the Fruit and Vegetable Division of the Department issued a complaint charging Norinsberg with PACA violations, and requesting that the Corporation's license be revoked because the violations were "willful, flagrant, and repeated."

A hearing before an ALJ was scheduled for July 1993. By that time, Norinsberg had reached payment agreements with all of its suppliers, but still owed about $250,000—personally guaranteed by the Norinsberg family—for the purchases at issue.

### B. *Procedural Background*

At the hearing, Norinsberg did not dispute that it had violated the PACA. Rather, through counsel and its sole witness, Mr. Norinsberg, the Corporation urged the ALJ to consider a number of mitigating circumstances, including: Norinsberg's financial difficulties; the fact that it had reached consensual payment agreements with its suppliers; the absence of any "actual harm" to its suppliers; and the potential harm to its creditors from suspending its license.

The Secretary called two witnesses from within the Department. William Addington, the investigator who had inquired into Norinsberg's PACA violations, testified to their nature and extent. The Secretary also presented a "sanction witness," Clare Jervis, who relayed the Department's recommendation of revocation to the ALJ. During Ms.

Jervis's testimony, Norinsberg requested production—under the Jencks Act, 18 U.S.C. § 3500—of a memorandum prepared by Jervis summarizing the agency file in the Norinsberg proceeding. After reviewing the document, the ALJ denied production on the grounds that it was "an internal agency analysis which [was] used in connection with its preparation for its case," and not a "statement that [the witness] had made with respect to th[e] substance of [her] direct testimony...."

At the close of the hearing, the ALJ issued an Oral Initial Decision and Order from the bench. He found that the Company had, in fact, failed to make "full payment promptly" for the shipments at issue, and that the violations were "willful, flagrant, and repeated." He adopted the Secretary's sanction recommendation and revoked Norinsberg's PACA license.

The Company appealed to the Department's Judicial Officer ("JO"), to whom the Secretary has delegated final authority in adjudicative proceedings. *See* 7 C.F.R. §§ 1.132(d), 2.35. The JO essentially adopted the decision of the ALJ, with some additional analysis of his own. *See In re The Norinsberg Corporation,* 52 Agric.Dec. 1617 (1993). The JO later rejected the Company's petition for rehearing, and stayed his order pending our consideration of Norinsberg's petition for review.

### II. ANALYSIS

### A. *The Secretary's Choice of Sanction*

■ Norinsberg's primary contention is that the Secretary's decision to revoke rather than suspend the Corporation's PACA license was an abuse of discretion. Norinsberg does not, however, challenge the Secretary's conclusion that the underlying PACA violations were "willful, flagrant and repeated," which justifies revocation under § 499h(a) and § 558(c) of the APA. Norinsberg also admits that it is the Secretary's policy to require that full payment be made by the time of the administrative hearing—together with present compliance with the PACA—to avoid the sanction of revocation in cases of "flagrant, repeated, and willful" vio-

lations. *See, e.g., In re Gilardi Truck & Transportation, Inc.,* 43 Agric.Dec. 118, 149–54 (1984). Nonetheless, Norinsberg urges that the Secretary was obligated to give greater weight to "mitigating factors" in determining the sanction in this case.

The Department has recently indicated that the particular circumstances of each case are a relevant part of the sanction analysis. In *In re S.S. Farms Linn County, Inc.,* 50 Agric.Dec. 476, 497 (1991), the JO wrote:

> [R]eliance will no longer be placed on the "severe" sanction policy set forth in many prior decisions [citation omitted]. Rather, the sanction in each case will be determined by examining the nature of the violations in relation to the remedial purposes of the regulatory statute involved, along with all relevant circumstances, always giving appropriate weight to the recommendations of the administrative officials charged with the responsibility for achieving the congressional purpose.

*See Norinsberg,* 52 Agric.Dec. at 1627. In light of *S.S. Farms,* we are somewhat puzzled by the Secretary's argument that our earlier case, *Finer Foods Sales Co., Inc. v. Block,* 708 F.2d 774, 782 (D.C.Cir.1983), is controlling precedent for the proposition that "alleged mitigating factors are irrelevant" to the Department's sanction determinations under the PACA. *Cf. ABL Produce, Inc. v. USDA,* 25 F.3d 641, 646 (8th Cir.1994) (holding that the JO had *not* considered "all relevant circumstances" in imposing the sanction of PACA license revocation, and remanding for reinstatement of suspension as ordered by the ALJ).

Nonetheless, we are convinced that the Secretary's determination in this case was consistent with the policy articulated in *S.S. Farms.* Norinsberg does not question that both the ALJ and the JO carefully "examin[ed] the nature of the violations in relation to the remedial purposes of the regulatory statute involved." It is equally clear that both "g[ave] appropriate weight to the recommendation[ ] of the administrative officials charged with the responsibility for achieving the congressional purpose"—indeed, they adopted the Department's recommendation

of license revocation. Norinsberg's challenge thus goes only to whether "all relevant circumstances" were considered.

The "circumstances" that Norinsberg claims the Department ignored fall into essentially four categories: (1) the Corporation's financial difficulties; (2) the various accords that Norinsberg eventually reached with its suppliers; (3) the absence of "actual harm" to the suppliers; and (4) the potential harm to the Corporation's creditors from suspending its license. Our review of the record, however, indicates that these "mitigating factors" were in fact all considered though ultimately rejected by the JO.

First, the JO observed that the Corporation's "financial hardship" resulted in large part from the Norinsberg family's efforts to rescue their non-PACA business enterprises. *See Norinsberg,* 52 Agric.Dec. at 1625. Moreover, when Norinsberg realized that its financial hardship would render it unable to meet the Act's prompt payment requirement, it did not seek written agreements from its suppliers providing for payment periods in excess of ten days, as authorized by the Department's regulations, *see* 7 C.F.R. § 46.2(aa)(11); instead it continued to make produce purchases without fulfilling the Act's prompt payment mandate. *Norinsberg,* 52 Agric.Dec. at 1625.

The JO also indicated that Norinsberg's consent settlements with its suppliers could not be considered "mitigating factors" under the PACA. *Id.* at 1626. Indeed, it would eviscerate the Act's prompt payment requirement if payment agreements reached after payment was due sufficed to erase the original violations. Nor was the JO convinced that there was no "actual harm" to the creditors; he cited testimony by the Department's sanction witness that failure to pay promptly would "hurt any produce firm." *Id.* at 1629. The JO also dismissed Norinsberg's objection that revoking the Corporation's license would cause hardship to its creditors, since the remaining debt to those sellers was personally guaranteed by Mr. Norinsberg.

■ Our review of the Secretary's choice of sanction is limited both by statute and Supreme Court precedent. The APA con-

fines our inquiry to whether the sanction imposed was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). Moreover, the Supreme Court has specifically stated that "the . . . choice of [administrative] sanction [is] not to be overturned unless the Court of Appeals [ ] find[s] it unwarranted in law or . . . without justification in fact. . . ." *Butz v. Glover Livestock Commission Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (internal citation omitted). On the particular facts of this case, we think it clear that the Secretary's decision to revoke Norinsberg's PACA license was within his discretion.

## B. *The Jencks Act*

■ Norinsberg also contends that the ALJ's failure to order disclosure of a prior statement by Clare Jervis, a Department official who testified at the administrative hearing, was prejudicial error. The Corporation made a timely request under the Jencks Act, 18 U.S.C. § 3500,[3] for a brief memorandum prepared by Jervis in connection with the case. The Department refused to disclose the document to the Corporation, but did provide it to the ALJ for review *in camera*. The ALJ ruled that it was not Jencks material on the grounds that it was "an internal memo of analysis rather than a factual memo with respect to evidence that was personally obtained by this witness," and was not a "statement that [the witness] had made with respect to th[e] substance of [her] direct testimony."[4]

The Jencks Act provides, in pertinent part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness . . . which relates to the subject matter as to which the witness has testified.

. . . .

(e) The term "statement," as used in subsection[ ](b) . . . in relation to any witness called by the United States, means—

(1) a written statement made by such witness and signed or otherwise adopted or approved by him. . . .

*Id.* §§ 3500(b), 3500(e). The Act thus states that a document must be divulged if it is both a witness's "statement" and "relates to" her testimony on direct examination. We therefore reject the ALJ's unfounded distinction between "factual" and "analytical" documents, and turn instead to the two-prong inquiry suggested by the Act.

The initial question is whether Jervis's memorandum was a "statement." The Secretary argues, citing *Blackfoot Livestock Com'n v. USDA*, 810 F.2d 916 (9th Cir.1987), that "brief memoranda" explaining the documents in an investigative file are not "statements" within the meaning of the Jencks Act. *Blackfoot* does not, however, sustain this broad reading. There the petitioner sought access to the Department's entire investigative file, including "records and documents, as well as brief memoranda explaining these documents." *Id.* at 923. The court wrote that "[b]ecause Blackfoot was given any memorandum authored by the testifying investigators, it was not denied Jencks materials. The statements and accompanying documents of witnesses who did not testify are [ ] not discoverable under the Jencks Act." *Id.* The memorandum not disclosed in this case was, of course, written by a "testifying investigator," and *Blackfoot* is therefore inapposite.

■ Cases decided under the Jencks Act however have drawn a distinction between "statements" and mere "notes." In *United States v. Carrasco*, 537 F.2d 372, 375 (9th Cir.1981), for example, the court wrote that "a statement[ ] unlike notes . . . seeks to transmit information from the declarant to the reader." Therefore, "rough [ ] notes" generally will not exhibit "sufficient completeness or intent to communicate" to qualify as Jencks Act statements. *United States*

---

3. ALJ proceedings within the Department are subject to the Jencks Act under 7 C.F.R. § 1.141(g)(1)(iii).

4. The ALJ also ruled that a cover sheet not prepared by Jervis was not Jencks material. Norinsberg does not dispute this holding and we do not discuss it here.

*v. Griffin,* 659 F.2d 932, 938 n. 4 (9th Cir. 1981). Applied to *Norinsberg,* however, the statements/notes distinction does not help the Secretary either. Having reviewed the document at issue in this case, we conclude that it was more than mere "notes"; the entire purpose of Jervis's "Memo to File" was to "transmit information" to any Department official who would later read it. We therefore find that Jervis's memorandum could qualify as a "statement" within the meaning of § 3500(e).

The question whether Jervis's statement "relates to"—*see* § 3500(b)—her testimony, however, poses greater difficulty. Jervis's direct testimony included three components. First, she interpreted for the ALJ documents indicating that Norinsberg had a current PACA license. She then testified regarding a number of phone calls to Norinsberg's suppliers, concerning the Corporation's debts outstanding to the sellers. Finally, she presented the Department's position that Norinsberg's license should be revoked, and explained why the Department thought that disposition would further the PACA's remedial purposes.

The great bulk of Jervis's memorandum does not bear directly on any of these three subjects; rather, it summarizes the factual background of the Norinsberg case from other documents in the agency file. Indeed, neither the phone calls—all of which occurred after the memorandum was written— nor the Department's sanction recommendation appears in the document at all. While we recognize that the term "relates to" is very broad in isolation, we note that the object of the prepositional phrase is "the subject matter *as to which the witness has testified* " (emphasis added), *not* the "subject matter of the proceeding" generally. It is therefore problematical in our view whether the summary of facts in the memorandum "relates to" Jervis's direct testimony regarding the phone calls or the sanction recommendation in the manner envisioned by the Act. *Cf. United States v. Smaldone,* 544 F.2d 456 (10th Cir.1976) (holding that a document summarizing a witness's general knowledge of drug trafficking in Denver, in which Smaldone was discussed, did not "relate to" the witness's trial testimony describing a particular drug transaction with Smaldone). The details contained in Jervis's memorandum "relate to" the phone call and sanction portions of Jervis's testimony only in the extremely attenuated sense that any fact about the case bears some "relation" to any testimony in the case.

We do not think that meaning of "relate" is intended by the Jencks Act. In construing the term "related to," we must keep the relevant purpose of the Act in view: "[T]he Jencks Act ... was intended to enable the defense to impeach a government witness by bringing any [ ] variances [between Jencks material and the witness's testimony] to the attention of [the finder of fact]." *United States v. Prieto,* 505 F.2d 8, 11 (5th Cir.1974); *see also United States v. Harrison,* 524 F.2d 421, 431 n. 29 (D.C.Cir.1975). The "relates to" provision of § 3500(b) thus serves to ensure that only documents overlapping with the subject matter of the testimony—and so potentially containing inconsistencies—need be disclosed. Because the memorandum sought in this case simply did not contain information on either the phone calls or the sanction recommendation, it could not conceivably have been used to impeach Jervis on those matters, and was not "related to" those portions of her testimony.[5]

■ On the other hand, the memorandum does contain several lines concerning the history and status of Norinsberg's PACA li-

---

5. Moreover, we note that it is highly questionable whether the main purpose for which Norinsberg sought the memorandum—to impeach Jervis's sanction testimony—would be a permissible one, even had the memorandum contained an inconsistent recommendation by Jervis. The witness's presentation of the Departmental sanction recommendation was not factual or even opinion testimony of her own, but rather represented the final product of agency deliberations. Any opinion of the witness that formed part of that deliberative process would presumably be protected from Jencks Act disclosure. *Cf. United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941) (intra-agency memoranda and documents leading to an agency decision are privileged from discovery, to preserve the integrity of the administrative process). Needless to say, however, it would be far less confusing to ALJs implementing the Jencks requirement to have the departmental recommendation presented in a form other than sworn testimony.

cense. This portion of the document "relates" to the opening portion of Jervis's testimony, which addressed the same subject matter. Clearly, to the extent the licensure facts in the memorandum differed from those presented by Jervis at the hearing, the document could have permitted impeachment of the witness. This part of the memorandum therefore does qualify as Jencks material, and should have been turned over to Norinsberg. We nonetheless conclude, however, that the failure to disclose the material does not entitle Norinsberg to a new administrative hearing.

It is true that the harmless-error standard is "strictly applied" to Jencks Act violations because holding an error harmless requires us to speculate whether Jencks material could have been used effectively in defense of the charge. *See, e.g., United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 (D.C.Cir.1991). But on the other hand "the Jencks Act does not contemplate automatic sanctions" for any violation. *Id.* Indeed, a number of courts have held harmless the failure to order disclosure of Jencks material where "the [information sought] merely duplicate[s] matter already in the defendant's possession." *See, e.g., United States v. Pepe*, 747 F.2d 632, 657 (11th Cir.1984); *United States v. Rivero*, 554 F.2d 213 (5th Cir.1977). In this case, Norinsberg clearly had independent access to the limited and basically innocuous licensure information in the Jervis memorandum.

### III. CONCLUSION

We find that the Secretary's choice of sanction was within his discretion. We further hold harmless any Jencks Act error committed. The petition for review is denied.

*So ordered.*