Jacob WONSOVER, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 99–1167.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 2000.

Decided March 14, 2000.

Adam D. Cole argued the cause for the petitioner. Martin E. Karlinsky, James W. Perkins and Frank C. Razzano were on brief for the petitioner.

Randall W. Quinn, Assistant General Counsel, Securities and Exchange Commission, argued the cause for the respondent. Jacob H. Stillman, Solicitor, David M. Becker, Deputy General Counsel, and Nathan A. Forrester, Attorney, Securities and Exchange Commission, were on the brief for the respondent. Rada L. Potts, Attorney, Securities and Exchange Commission, entered an appearance.

Before: SENTELLE, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Jacob Wonsover petitions for review of the Security and Exchange Commission's (Commission) Order Imposing Remedial Sanction and the accompanying Opinion of the Commission (collectively, Sanction Order) suspending him "from association with any broker or dealer for a period of six months" and ordering him to cease and desist from committing or causing violations of sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c) (1933 Act). Joint Appendix (JA) 1, 2. Wonsover sold shares of Gil–Med Industries, Inc. (Gil–Med) which he knew were not registered and whose sale therefore violated the 1933 Act absent an exemption from its registration requirements. Finding that no exemption applied, the Commission determined that Wonsover violated sections 5(a) and 5(c). The Commission also determined that Wonsover's inquiry into the sources of the shares was inadequate under the circumstances and that his violations were therefore "willful" under section 15(b)(4) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b)(4) (Exchange Act), which authorized his suspension.

While he argues his sales of unregistered securities were exempt from the 1933 Act's prohibition, Wonsover primarily disputes the Commission's finding of willfulness, contending his inquiry regarding the unregistered shares was adequate to preclude such a finding. Wonsover also argues that the sanction is draconian and that the public interest would be better served by reducing it to a censure. He requests that we vacate the Commission's Sanction Order or, in the alternative, reduce the sanction to censure.

Substantial evidence supports the Commission's conclusion that Wonsover acted without adequate inquiry under the circumstances, in violation of sections 5(a) and 5(c) of the 1933 Act, and we hold that the Commission did not err in determining that the violations were willful. The sanc-

tion was not the maximum the Commission could have imposed and we defer to the Commission's discretionary determination. Accordingly, we deny Wonsover's petition for review.

## I.

Wonsover began his career in the securities industry in 1981. Approximately five years later he met Shimon Gibori, the founder and CEO of Gil–Med. Gil–Med made an initial public offering in early 1988, registering with the Commission 1,050,000 shares (of 4,605,686 outstanding) for sale to the public. This, the only stock Gil–Med registered, was traded publicly on the NASDAQ System. On the whole, the stock did not have much activity; its market was "thin." JA 841, 1103–06. Henry Vogel, a behavioral therapist and Gibori associate who invested in and promoted Gil–Med, sold shares to his friends, associates and patients during 1988 and 1989. Informed of the difficulty shareholders were having in selling the stock, Gibori and Vogel directed them to certain brokerage firms for help. The shareholders found less than complete success and Gibo-

ri ultimately referred them to Wonsover, who was working at Paine Webber, Inc.

Between August 1989 and October 1990 Wonsover opened accounts for nineteen purported Gil–Med shareholders whose names were supplied to him by Gibori.[1] Some of the shareholders did not exist while others no longer owned the Gil–Med shares held (and later sold) in their names.[2] Wonsover sold a total of 924,000 shares of unregistered Gil–Med stock. In light of the applicable statute of limitations, the Commission focused on the sale of 665,000 shares for seven of the nineteen shareholders because the sales occurred within five years of the Commission's institution of proceedings against Wonsover.[3] Sales from the seven shareholders' accounts generated more than $300,000 in proceeds.

Wonsover understood that the clients held "restricted" Gil–Med stock.[4] The sale of restricted stock generally is forbidden by 15 U.S.C. § 77e. Wonsover, however, asserts that the sales were covered by the exemption found in section 4(4) of the 1933 Act, 15 U.S.C. § 77d(4),[5] or at least that he reasonably believed they were covered by the exemption.[6] He directed all potential

1. Counsel for petitioner conceded at oral argument that Wonsover had personally met none of the shareholders, with the possible exception of Vogel.

2. Gibori and Vogel had earlier bought shares back from certain investors who had experienced difficulty selling them.

3. In this opinion we refer to facts surrounding the sales of Gil–Med shares without distinguishing the seven shareholders from the remaining twelve. The information available to Wonsover regarding sales and accounts for the twelve Gil–Med shareholders whose accounts are not included among the seven accounts at issue is relevant to his culpability for activity involving the seven Gil–Med accounts the Commission reviewed inasmuch as they shed light either on Wonsover's knowledge of and investigation into the background of the unregistered shares or on his sale of the shares without knowing of their background or adequately investigating it.

4. "[R]estricted" stock is defined as "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a

transaction or chain of transactions not involving any public offering." 17 C.F.R. § 230.144(a)(3)(i).

5. This section exempts "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders." 15 U.S.C. § 77d(4). The exempted "brokers' transactions" are further defined in the Commission's regulations and the portion Wonsover relies on covers "transactions by a broker in which such broker ... [a]fter reasonable inquiry is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer." 17 C.F.R. § 230.144(g)(3).

6. Wonsover no longer argues that the transactions were covered under various other exemptions, as he did before the Commission, see JA 10–17.

sales of Gil–Med shares through Paine Webber's Restricted Stock Department (RSD) for clearance and contends that this, along with some less substantial efforts, constituted adequate inquiry into the restricted nature of the stock. The referral to the RSD notwithstanding, Wonsover did not show during the administrative proceedings that he had acquired adequate background information on the Gil–Med stock. Specifically, he could not produce investment executive worksheets for any of the nineteen account-holders. The worksheets, which he and other Paine Webber brokers ordinarily complete when requesting clearance from the RSD, reflect how and when the shareholders acquired the shares at issue. Nevertheless, he claims the RSD contacted Gil–Med's transfer agent, its lawyers and its auditors and ultimately approved every sale of Gil–Med stock. Wonsover also cites written confirmation he received from Gil–Med's transfer agent and attorneys that the sales were legitimate. He claims to have been duped by Vogel pretending to be one of the listed, fictitious customers (Haim Cheap). In fact, Wonsover relies on how elaborate and effective Gibori and Vogel's ruse was[7] in arguing that his actions were not willful violations of the 1933 Act.

Early in the administrative proceedings Wonsover freely admitted (but would later recant) that he made no inquiry into how or when the Gil–Med shareholders acquired their stock. See, e.g., JA 836, 846–48. Instead, he passed the duty of inquiry to Paine Webber's RSD and lawyers. See JA 836. The Commission demonstrates that several "red flags" should have alerted Wonsover to the fact that Gibori in fact controlled the unregistered shares Wonsover was selling and, therefore, no exemption was available.[8] Those red flags include Gibori's exercise of an unusual amount of control over the nineteen ac-

counts. He delivered account documentation, picked up proceeds checks and held trading authorization for at least two accounts. Some purported shareholders resided overseas. Fourteen of the nineteen listed Gil–Med headquarters as their official address and many listed Gil–Med's telephone number too. Despite the foreign mailing addresses of three account holders, Wonsover heeded Gibori's instructions and directed their checks to Gil–Med and their correspondence to Gil–Med to Gibori's attention. Similarly, many of the accounts contained suspicious information. Some account forms represented U.S. citizenship while corresponding W–8 forms certified foreign citizenship. Several had identical personal addresses in Tel Aviv and identical bank references. Some of the stock certificates forged by Gibori and Vogel, which the Commission believes were amateurishly forged, listed only a surname that, in one instance, was misspelled.

In addition to their relation to Gibori, the shareholders also had an affiliation with Gil–Med. Some used Gil–Med headquarters as their personal mailing address and some even identified their occupation as sales representatives for Gil–Med. Another red flag was that the nineteen shareholders, collectively, sought to sell a substantial block of Gil–Med (924,000 shares, nearly equaling the entire public float of 1,050,000), a stock Wonsover knew was not widely traded. The Commission also notes that the S–18 registration statement of the 1988 offering reflected no ownership by any of the nineteen shareholders and thus directly contradicted Wonsover's stated belief that those shareholders acquired their shares in 1986 or 1987 in private placements. See JA 1179–80. The last red flag the Commission identifies was the difficulty in clearing the sales with the Gil–

**7.** A separate civil action left Gibori permanently enjoined from serving as an officer or director of a public company. Vogel resolved the Commission's charges through settlement. See JA 5 n.7.

**8.** The Commission concluded that Gibori, as the founder and CEO of Gil–Med who controlled the Gil–Med accounts, was in effect an underwriter, making the exemption inapplicable. See supra note 5.

Med transfer agent and the RSD, a difficulty Wonsover was aware of and which he had not encountered in gaining approval for sale of properly exempt, restricted stock in the past. In response to the RSD's hesitation, he made repeated telephone calls to push for its approval, including falsely claiming the shareholders were poor and needed the money immediately. *See* JA 982.

In a detailed opinion, the Commission affirmed the administrative law judge's (ALJ) conclusion that Wonsover violated sections 5(a) and 5(c) of the 1933 Act, 15 U.S.C. § 77e,[9] and that the violations were willful under section 15(b)(4) of the Exchange Act, 15 U.S.C. § 78o(b)(4),[10] which grants the Commission authority to suspend brokers for willful violations of the 1933 Act. The Commission suspended Wonsover "from association with any broker or dealer for a period of six months" and, pursuant to 15 U.S.C. § 77h-1, ordered him to cease and desist from committing or causing violations of sections 5(a) and 5(c) of the 1933 Act. *See* JA 1, 2.

9. **§ 77e. Prohibitions relating to interstate commerce and the mails**
    (a) Sale or delivery after sale of unregistered securities
    [**Section 5(a)**] Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
    (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
    ...
    (c) Necessity of filing registration statement
    [**Section 5(c)**] It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal

## II.

We review the Commission's findings of fact for substantial evidence. *See Steadman v. SEC,* 450 U.S. 91, 97 n. 12, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("Commission findings of fact are conclusive for a reviewing court 'if supported by substantial evidence.'") (quoting 15 U.S.C. §§ 78y, 80a–42, and 80b–13); 15 U.S.C. § 77i ("The finding of the Commission as to the facts, if supported by evidence, shall be conclusive."); *see also Steadman,* 450 U.S. at 96, 101 S.Ct. 999 (securities laws provide scope of judicial review of Commission disciplinary proceedings). As for the Commission's conclusions of law, we apply the standards set forth in the Administrative Procedure Act (APA) and "will set aside [its] legal conclusions only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." *Proffitt v. FDIC,* 200 F.3d 855, 860 (D.C.Cir.2000). Our review of the Commission's sanction is limited both by the APA and Supreme Court precedent. *See Norinsberg Corp. v.*

order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.
15 U.S.C. § 77e.

10. Section 78o, entitled "Registration and regulation of brokers and dealers," reads in pertinent part as follows:

    (b) Manner of registration of brokers and dealers
    ...
    (4) The Commission, by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds, on the record after notice and opportunity for hearing, that such censure, placing of limitations, suspension, or revocation is in the public interest and that such broker or dealer, whether prior or subsequent to becoming such, or any person associated with such broker or dealer, whether prior or subsequent to becoming so associated—
    ...
    (D) has willfully violated any provision of the Securities Act of 1933....

*Department of Agriculture*, 47 F.3d 1224, 1227 (D.C.Cir.), *cert. denied*, 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995). The APA limits our inquiry to whether the Commission's sanction was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see Norinsberg Corp.*, 47 F.3d at 1227–28, and the Supreme Court has told us not to disturb the Commission's choice of sanction unless it is either "unwarranted in law or . . . without justification in fact." *Id.* at 1228 (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (ellipsis in original) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 (1946))); *accord Pharaon v. Board of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C.Cir.1998); *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1294 (D.C.Cir.1996). "The main point is that a court should not second-guess the judgment of the Commission in connection with the imposition of sanctions, unless the [Commission] has acted contrary to law, without basis in fact or in abuse of discretion." *Svalberg v. SEC*, 876 F.2d 181, 185 (D.C.Cir.1989).

Wonsover contends that the Commission applied the incorrect standard in determining willfulness and, in any event, his conduct was not willful under either standard.[11] He focuses on the ALJ's articulation of the willfulness standard: "It is well-settled that a finding of willfulness under [section 15(b)(4) of] the Exchange Act does not require an intent to violate, but merely an intent to do the act which constitutes the violation." JA 85. In his opening brief, Wonsover argued that the government must prove he acted with knowledge that his conduct was unlawful,

*see* Brief of Petitioner at 21, but he subsequently changed the standard to reckless disregard. *See* Reply Brief at 3–9. While the Commission did not endorse the ALJ's standard, it expressly affirmed his decision under either formulation of willfulness, to wit: intentional commission of the act constituting the violation or knowledge of (or reckless disregard of) the fact that his conduct violated the law. *See* JA 17–21.

Wonsover argues that to find willfulness where the actor had no knowledge that his conduct was unlawful would extinguish the higher degree of culpability the willfulness requirement establishes in what Wonsover calls a two-tiered system of broker liability exposing only willful violators to the more severe sanctions of censure and suspension. In other words, he claims the Commission applied a standard rendering the Congress' use of "willfully" meaningless instead of a standard requiring proof of the actor's knowledge that his conduct violated the law or, at a minimum, that he acted in reckless disregard of the law. Most of the cases Wonsover relies on, however, apply to statutory schemes different from the 1933 Act and the Exchange Act, *see* Brief of Petitioner at 21–22 (citing, for example, *Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (statute prohibiting unlicensed dealing in firearms); *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (antistructuring laws for domestic banks); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 129, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (ADEA)), and several involve criminal prosecutions, *see id.* (citing, for example, *Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (income tax evasion)). *See generally United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir.1998)

---

**11.** Although also arguing that the transactions were exempt under section 4(4) of the 1933 Act, 15 U.S.C. § 77d(4), Wonsover does not dispute that the accounts and sales involved a statutory underwriter, a factor which ordinarily forecloses the exemption. *See* 17 C.F.R. § 230.144(g). Rather, he claims he was ignorant of that fact at the time of the

transactions despite what he contends was reasonable inquiry. If his contention were to hold, the exemption might be available to him. *See id.* § 230.144(g)(3). Our resolution of this issue, therefore, turns on whether Wonsover's inquiry was reasonable under the circumstances.

(distinguishing *Ratzlaf* and *Cheek* from securities cases). Wonsover does cite a Supreme Court opinion, as well as the Eighth Circuit's opinion on remand, interpreting section 10(b) of the Exchange Act. *See, e.g.,* Brief of Petitioner at 22–23 (citing *United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), *on remand* 139 F.3d 641 (8th Cir.1998)). The Supreme Court rejected by implication Wonsover's assertion that one must know of the relevant legal requirement for his act to willfully violate that requirement. *See O'Hagan,* 521 U.S. at 665–66, 117 S.Ct. 2199 (discussing *"two* sturdy safeguards Congress has provided regarding scienter" first, that "Government must prove that a person 'willfully' violated the provision" and second (and independently), that "defendant may not be imprisoned for violating Rule 10b–5 if he proves that he had no knowledge of the rule") (emphasis added). On remand the Eighth Circuit followed suit: "Courts that have interpreted 'willfully' in § 32 [of the Exchange Act] have reached the same conclusion that we reach in this case: 'willfully' simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required." *See O'Hagan,* 139 F.3d at 647.

Willfulness is usually understood to be contextual. *See Ratzlaf,* 510 U.S. at 141, 114 S.Ct. 655 ("Willful ... is a word of many meanings, and its construction [is] often ... influenced by its context.") (internal quotation marks omitted) (quoting *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943)). In the context of the provision at issue here, we have rejected the knowledge and the reckless disregard standards and defined willfulness thus: ·

> It is only in very few criminal cases that "willful" means done with a bad purpose. Generally, it means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.

*Hughes v. SEC,* 174 F.2d 969, 977 (D.C.Cir.1949) (internal quotation marks omitted). In *Gearhart & Otis, Inc. v.*

*SEC,* 348 F.2d 798 (D.C.Cir.1965), we rejected the argument "that specific intent to violate the law is an essential element of the willfulness required to violate Section 15(b)" and noted that the argument "ha[d] been rejected by this court, by the Second Circuit, and by the Commission." 348 F.2d at 802–03. We further stated that "[i]t has been uniformly held that 'willfully' in this context means intentionally committing the act which constitutes the violation" and rejected the contention that "the actor [must] also be aware that he is violating one of the Rules or Acts." *Id.* at 803.

In his reply brief and at oral argument, Wonsover seized on our discussion of "willful misconduct" and "reckless disregard" in *Saba v. Compagnie Nationale Air France,* 78 F.3d 664 (D.C.Cir.1996), a decision interpreting the Warsaw Convention. Wonsover contends that *Saba,* which discussed cases involving securities laws, demands application of a *subjective* recklessness standard, a standard more demanding than ordinary reckless disregard. In *Saba* we acknowledged the two recklessness standards we have applied and distinguished the more demanding subjective standard from the one more akin to gross negligence: "One meaning of recklessness, then, is simply a linear extension of gross negligence, a palpable failure to meet the appropriate standard of care[, and the] second, as we have recognized in other contexts, is a legitimate substitution for intent to do the proscribed act because, if shown, it is a proxy for that forbidden intent." 78 F.3d at 668 (citation omitted). One of the "other contexts" the *Saba* court cited was the review of securities law violations. Describing that standard, the court said that either the defendant must have known the risk of violation his action presented or his action posed a risk "so obvious [he] must have been aware of it." *Id.* at 668–69 (quoting *SEC v. Steadman,* 967 F.2d 636, 641 (D.C.Cir.1992) (reversing SEC's determination that appellants violated section 17(a)(1) of 1933 Act, section 10(b) and Rule 10b–5 under Exchange Act

and section 206(1) of Investment Advisers Act)). In other words, "if it can be shown that a defendant gazed upon a specific and obvious danger, a court can infer that the defendant was cognitively aware of the danger and therefore had the requisite subjective intent." *Id.* at 669.

■ Here, the Commission based its determination of willfulness on Wonsover's failure to conduct sufficient inquiry into the sources of the unregistered Gil–Med shares in the circumstances before him. The Commission's regulations permit a broker's transaction if the broker "[a]fter reasonable inquiry is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer." 17 C.F.R. § 230.144. An oft-quoted paragraph of a Commission release clarifies when a broker's inquiry can be considered reasonable:

> The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

*Distribution by Broker–Dealers of Unregistered Securities,* Securities Act Rel. No. 33–4445 (Feb. 2, 1962). The circumstances facing Wonsover did not involve a modest offer, a widely traded security or a customer with no relationship to the issuer. Rather, the Gil–Med shareholders whose names Gibori gave Wonsover offered him a substantial block of a little-known and thinly traded security under circumstances raising questions not only as to whether the ostensible sellers may have been intermediaries for controlling persons or statutory underwriters but also whether they even existed. Clearly, a "searching inquiry" was called for.

Wonsover failed to investigate the Gil–Med accounts despite Gibori's unusual degree of control over the accounts, many of the shareholders' apparent affiliation with Gil–Med, the sheer amount of shares involved for a thinly traded stock (nearly equaling the public float), the inconsistent account documentation and his difficulty in securing RSD clearance. We conclude that substantial evidence supports the Commission's finding that Wonsover's inquiry was not reasonable under the circumstances and that the Commission did not err in determining that his resulting violations were willful under our traditional formulation of willfulness for the purpose of section 15(b) or even under the subjective recklessness standard Wonsover presses.[12] Precedent will not suffer Wonsover's argument that he justifiably relied on the clearance of sales by the RSD, the transfer agent and counsel. *See, e.g., O'Leary v. SEC,* 424 F.2d 908, 912 (D.C.Cir.1970) (reliance on advice of counsel potentially mitigating but not exculpatory); *Sorrell v. SEC,* 679 F.2d 1323, 1327 (9th Cir.1982) (broker's reliance on counsel's advice did not excuse his own lack of investigation); *Stead v. SEC,* 444 F.2d 713, 716 (10th Cir.1971) ("The act of ... calling the transfer agent is obviously not a sufficient inquiry."); *A.G. Becker Paribas Inc.,* 48 S.E.C. 118, 121 (1985) ("If a broker relies on others to make the inquiry called for in any particular circumstances,

---

**12.** Our decision upholding the Commission's finding of willfulness leaves Wonsover no room to argue that he conducted a reasonable inquiry (or was unaware of circumstances foreclosing the exemption) and that the sales were thus exempt under section 4(4) of the 1933 Act.

it does so at its peril."). As Paine Webber's Rule 144 Manual cautioned, "[a]n investment executive ... has the primary responsibility to prevent illegal sales of restricted or control stock." Brief of Commission at 18.

■ Wonsover's argument that the sanction should be reduced also fails. The statute authorizing the Commission to suspend Wonsover limits when and how the sanction can be imposed. The Commission must "find[], on the record after notice and opportunity for hearing, that such ... suspension ... is in the public interest." 15 U.S.C. § 78o(b)(4). The Commission complied with the statute's directives and expressly considered, among other aggravating and mitigating factors, "the effect of Wonsover's misconduct on both the securities industry as a profession and on the investing public." JA 24–25. The sanction fell within the spectrum of the Commission's statutory authority, *see* 15 U.S.C. § 78o(b)(4); § 77h–1, and choosing a point on that spectrum is a determination left to the Commission. *See O'Leary,* 424 F.2d at 912 ("[A]s to petitioners' protest that they 'were first offenders,' acting in accord with advice of counsel, and causing no injury to the investing public, we concur with Chief Judge Lumbard's statement in *Tager v. SEC,* 344 F.2d 5, 8 (2d Cir.1965): 'While these factors might have warranted a lighter sanction, they did not require one.' ").

For the foregoing reasons, we conclude that substantial evidence supports the Commission's determination that Wonsover failed to conduct reasonable inquiry into the sources of the unregistered shares he sold and that his inadequate inquiry in the face of several "red flags" justified a finding of willfulness. In addition, we find no abuse of discretion in the Commission's chosen sanction. Accordingly, Wonsover's petition for review is

*Denied.*