# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 23, 2019          Decided April 30, 2019

No. 16-1453

THE ROBARE GROUP, LTD., ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of an Order of
the Securities & Exchange Commission

———

*Heidi E. VonderHeide* argued the cause for petitioners. With her on the briefs was *Alan M. Wolper*.

*Daniel E. Matro*, Senior Counsel, U.S. Securities and Exchange Commission, argued the cause for respondent. With him on the brief was *John W. Avery*, Deputy Solicitor.

Before: ROGERS, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Robare Group, an investment adviser, and its principals petition for review of the decision of the Securities and Exchange Commission that they violated

Section 206(2) and Section 207 of the Investment Advisers Act, 15 U.S.C. §§ 80b–6(2), 80b–7. They contend that the Commission's findings of inadequate disclosure of financial conflicts of interest over a period of years are not supported by substantial evidence, as shown by the contrary decision of the administrative law judge. Upon review, we hold that the Commission's findings of negligent violations under Section 206(2) are supported by substantial evidence, but the Commission's findings of willful violations under Section 207 based on the same negligent conduct are erroneous as a matter of law. Accordingly, we deny the petition in part, grant the petition in part, and remand the case for the Commission to determine the appropriate remedy for the Section 206(2) violations.

## I.

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). Like the Securities Act of 1933 and the Securities Exchange Act of 1934, the Investment Advisers Act was intended "to achieve a high standard of business ethics in the securities industry." *Id.* Accordingly, the Act "establishes 'federal fiduciary standards' to govern the conduct of investment advisers," *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 471 n.11 (1977)), imposing on them "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,'" *Capital Gains*, 375 U.S. at 194 (quoting WILLIAM L. PROSSER, LAW OF TORTS 534–35 (2d ed. 1955)). This reflects "a congressional intent to eliminate, or at least to expose, all

conflicts of interest which might incline an investment adviser — consciously or unconsciously — to render advice which [is] not disinterested." *Id.* at 191–92. Moreover, the anti-fraud provisions of the Advisers Act do not "require proof of . . . actual injury to the client." *Id.* at 195.

Two anti-fraud provisions of the Advisers Act are at issue here. They work in tandem: Section 206 governs disclosures to clients, while Section 207 governs disclosures to the Commission. Section 206 provides, in relevant part:

> It shall be unlawful for any investment adviser . . . directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]

15 U.S.C. § 80b–6. Citing *Capital Gains*, the Securities and Exchange Commission has long held that "[f]ailure by an investment adviser to disclose potential conflicts of interest to its clients constitutes fraud within the meaning of Sections 206(1) and (2)." *Fundamental Portfolio Advisors, Inc.*, Investment Advisers Act Release No. 2146, 80 SEC Docket 1851, 2003 WL 21658248 at *15 & n.54 (July 15, 2003). A violation of Section 206(1) requires proof of "scienter," that is, proof of an "intent to deceive, manipulate, or defraud." *SEC v. Steadman*, 967 F.2d 636, 641 & n.3 (D.C. Cir. 1992) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). Proof of simple negligence suffices for a violation of Section 206(2), however. *Id.* at 643 n.5 (citing *Capital Gains*, 375 U.S. at 195).

Additionally, Section 207 of the Advisers Act provides:

> It shall be unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under section 80b–3 or 80b–4 of this title, or willfully to omit to state in any such application or report any material fact which is required to be stated therein.

15 U.S.C. § 80b–7. The investment adviser registration application filed pursuant to Section 80b–3 is known as Form ADV. *See id.* § 80b–3(c); 17 C.F.R. § 275.203–1(a).

Here, the relevant background is that The Robare Group (TRG) located in Houston, Texas registered in 2003 as an independent investment adviser with the Commission after being state-registered since 2001. From the beginning TRG used Fidelity Investments for execution, custody, and clearing services for its advisory clients. In 2004, TRG entered into a "revenue sharing arrangement" with Fidelity whereby Fidelity paid TRG when its clients invested in certain funds "offered on Fidelity's on-line platform." *Robare Grp., Ltd.*, Investment Advisers Act Release No. 4566 at 2, 115 SEC Docket 2796, 2016 WL 6596009 (Nov. 7, 2016) (hereinafter *Decision*). Between September 2005 and September 2013, TRG received from Fidelity approximately four hundred thousand dollars, which was approximately 2.5% of TRG's gross revenue. *Id.* at 3. As of August 26, 2013, TRG served as investment adviser to approximately 350 separately managed discretionary accounts and had approximately $150 million in assets under management.

In September 2014, the Division of Enforcement at the Securities and Exchange Commission instituted administrative

and cease-and-desist proceedings against TRG and its principals, Mark L. Robare (83% owner) and Jack L. Jones (17% owner). The Division alleged that they had failed for many years to disclose to their clients and to the Commission the compensation TRG received through its arrangement with Fidelity and the conflicts of interest arising from that compensation. Specifically, the Division alleged that Mark Robare and TRG willfully violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b–6(1), (2); Jack Jones aided, abetted, and caused the violations; and all three willfully violated Section 207 of the Act, 15 U.S.C. § 80b–7.

Following an evidentiary hearing, an administrative law judge dismissed the charges. He found that Mark Robare and Jack Jones had not acted "with scienter or any intent to deceive, manipulate or defraud" their clients, and that the Enforcement Division had failed to prove a negligent violation under Section 206(2) or a willful violation under Section 207. *Robare Grp., Ltd.*, Initial Decision Release No. 806 at 39, 42–44, 111 SEC Docket 3765, 2015 WL 3507108 (June 4, 2015) (hereinafter *Initial Decision*). The Division sought review by the Commission. *See* 15 U.S.C. § 78d–1; 17 C.F.R. § 201.410(a).

Upon *de novo* review, the Commission conducted an "independent review of the record," *Decision* at 2, and concluded that Mark Robare and TRG, "as investment advisers with fiduciary obligations to their clients, failed adequately to disclose material conflicts of interest" to their clients, and that "in so doing they acted negligently (but without scienter) and thus violated Section 206(2) . . . (but not Section 206(1))," *id.* at 7. The Commission also found that "[Jack] Jones caused the violations of Section 206(2)" and was "therefore liable." *Id.* (citing Advisers Act § 203(k), 15 U.S.C. § 80b–3(k)). The Commission further found that TRG and its principals violated Section 207 because Mark Robare and Jack Jones failed to

disclose material conflicts of interest to the Commission on TRG's Forms ADV. *Id.* at 15. Because TRG and its principals repeatedly breached their "fundamental fiduciary duty to provide full and fair disclosure of all material facts," and because of their "continuing responsibilities in the investment advisory industry," the Commission determined there was "a sufficient risk of future violations" to warrant issuance of a cease-and-desist order. *Id.* at 16. In addition, the Commission concluded that "the serious nature of the violations" warranted imposition of $50,000 civil monetary penalties on TRG and on each of its principals. *Id.* at 16–17.

The Commission's decision revolved around TRG's 2004 "revenue sharing arrangement" with Fidelity. *See id.* at 2–3. Under this arrangement, the Commission found that:

> Fidelity paid TRG "shareholder servicing fees" when its clients, using the on-line platform, invested in certain "eligible" non-Fidelity, non-transaction fee funds. Fidelity would pay between two and twelve basis points, in an increasing formula, based on the value of eligible assets under management. The fees were paid to [TRG] through Triad [Advisers, a brokerage firm TRG used to execute trades], which itself received 10 percent of the payments. As explicitly stated in its agreement with Fidelity, TRG acknowledged that it was "responsible for reviewing and determining whether additional disclosure is necessary in [its] Form ADV."

*Id.* (third alteration in original). When the arrangement was revised in 2012, Fidelity began paying fees directly to TRG and TRG agreed to "provide 'back-office, administrative, custodial support and clerical services' for Fidelity in exchange for the fees." *Id.* at 3. TRG also "agreed that it had 'made and [would]

continue to make all appropriate disclosures to Clients . . . with regard to any conflicts of interest'" arising from the arrangement. *Id.* (second alteration in original). Yet the Commission found that TRG and its principals did not "provide *any* disclosure of the [a]rrangement before December 2011," *id.* at 17 (emphasis added), and did not adequately disclose the arrangement "until at least April 2014," *id.* at 8. It concluded that they were negligent, and therefore violated Section 206(2), because the "obvious inadequacy" of their disclosures to clients, *id.* at 14, demonstrated a "failure to exercise reasonable care," *id.* at 12. The Commission also found that TRG and its principals "violated Section 207 by willfully omitting material facts from TRG's Forms ADV," explaining that Mark Robare and Jack Jones "both reviewed each of the Forms ADV before filing" them with the Commission and "were responsible for [their] content." *Id*. at 15.

## II.

TRG and its principals challenge the Commission's findings that they violated Section 206(2) by negligently failing to disclose the arrangement with Fidelity to their clients. They contend that the record shows they provided the necessary disclosures. Alternatively, they contend that the Enforcement Division failed to prove they engaged in negligent conduct. Neither contention succeeds.

The court must uphold the Commission's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Kornman v. SEC*, 592 F.3d 173, 184 (D.C. Cir. 2010). The Commission's findings of fact are conclusive when supported by substantial evidence, 15 U.S.C. § 80b–13(a), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Koch v. SEC*, 793 F.3d 147,

8

151–52 (D.C. Cir. 2015) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

**A.**

TRG and its principals have stipulated that the receipt of payments under the arrangement with Fidelity created actual or potential conflicts of interest. Mark Robare and Jack Jones concede that the arrangement created an incentive for them to maximize their payments from Fidelity by advising clients to invest in eligible funds rather than non-eligible funds, although they deny this ever occurred in fact. ALJ Hr'g Tr. 335 (Feb. 10, 2015); *id*. at 725 (Feb. 11, 2015). They maintain that the ALJ correctly found there was insufficient evidence to establish the legal standard of care imposed on investment advisers with regard to Form ADV disclosures. In their view, they adequately disclosed the conflicts of interest arising from the payment arrangement with Fidelity through statements in TRG's Forms ADV, TRG's General Information and Disclosure Brochure, and Fidelity's Brokerage Account Client Agreement. A review of the record shows abundant evidence supports the Commission's contrary findings.

The Commission found that TRG's Forms ADV did not fully and fairly disclose the potential conflicts of interest arising from the payment arrangement with Fidelity until at least April 2014. *See Decision* at 8–11. Item 13 of Part II of the Form ADV in use from 2004 until October 2010 required investment advisers to indicate whether they "receive[d] some economic benefit . . . from a non-client in connection with giving advice to clients." TRG accurately reported that it did. Item 13 also instructed advisers to "describe [such] arrangements on Schedule F." From February 2004 until August 2005, TRG's Schedule F description stated: "Mark Robare, Carol Hearn & Jack Jones sell securities and insurance

products for sales commissions." From August 2005 until March 2011, it stated:

> Certain investment adviser representatives of ROBARE, when acting as registered representatives of a broker-dealer, may receive selling compensation from such broker-dealer as a result of the facilitation of certain securities transactions on Client's behalf through such broker-dealer.
>
> Additionally, investment adviser representatives of ROBARE, through such representative's association as a licensed insurance agent, may also receive selling compensation resulting from the sale of insurance products to clients of ROBARE.
>
> These other arrangements may create a conflict of interest.

As the Commission found, these statements "did not disclose that [TRG] had entered into an [a]rrangement under which it received payments from Fidelity for maintaining client investments in certain funds Fidelity offered." *Decision* at 9. Even assuming the payments from Fidelity could properly be characterized as "sales commissions" or "selling compensation," which was disputed, *see id.* at 6 & n.6; *Initial Decision* at 23–24, 33–35, TRG's Forms ADV "in no way alerted its clients to the potential conflicts of interest presented by the undisclosed [a]rrangement," *Decision* at 9.

Item 14 of Part 2A of the amended Form ADV in use since October 1, 2010 instructs investment advisers (1) to "generally describe" any arrangement in which they receive an economic benefit from a non-client "for providing investment advice or other advisory services" to clients; (2) to "explain the conflicts

of interest" arising from any such arrangement; and (3) to "describe how [they] address the conflicts of interest." TRG filed an updated Form ADV in March 2011, stating in response to Item 14:

> We do not have any arrangement under which it or its related person compensates, or receives compensation from, another for client referrals at this time.
>
> Certain of our [Independent Advisor Representatives], when acting as registered representatives of Triad, may receive selling compensation from Triad as a result of the facilitation of certain securities transactions on your behalf through Triad. Such fee arrangements shall be fully disclosed to clients. In connection with the placement of client funds into investment companies, compensation may take the form of front-end sales charges, redemption fees and 12(b)–1 fees or a combination thereof. The prospectus for the investment company will give explicit detail as to the method and form of compensation.

This filing did not describe the payment arrangement with Fidelity much less alert TRG's clients to the potential conflicts of interest it created. At the ALJ hearing, a senior vice president from Fidelity testified that when Fidelity's compliance team reviewed TRG's Form ADV in late 2011, it found "no mention" of the payment arrangement. ALJ Hr'g Tr. 64 (Feb. 9, 2015). The Commission "f[ou]nd it telling" that the compliance team "'did not find' the disclosure of the [a]rrangement and requested that TRG disclose it." *Decision* at 10 (quoting December 2011 email from Fidelity to TRG). The Commission agreed with the Enforcement Division that "no reasonable client reading" TRG's pre-December 2011

Forms ADV "could have discerned the existence — let alone the details — of the [a]rrangement." *Id.*

Indeed, the record shows that it was only after Fidelity told TRG that it would cease making payments if their arrangement were not disclosed that TRG modified its Form ADV to specifically refer to the arrangement. TRG's December 2011 response to Item 14 stated in an opening sentence: "We do not receive an economic benefit from a non-client for providing investment advice or other advisory services to our clients." This "was false," *id.* at 11, inasmuch as TRG's previous Forms ADV acknowledged the Fidelity compensation was that type of economic benefit. TRG's December 2011 response continued, however:

> Additionally, we may receive additional compensation in the form of custodial support services from Fidelity based on revenue from the sale of funds through Fidelity. Fidelity has agreed to pay us a fee on specified assets, namely no transaction fee mutual fund assets in custody with Fidelity. This additional compensation does not represent additional fees from your accounts to us.

Although TRG's December 2011 filing mentioned the payment arrangement with Fidelity, the Commission concluded, as is evident, that

> [b]ecause it failed to mention that not all "no transaction fee mutual fund assets in custody with Fidelity" resulted in [payments to TRG], the disclosure failed to reveal that TRG had an economic incentive to put client assets into eligible non-Fidelity, non-transaction fee funds over other funds available on the Fidelity platform. Without this information,

TRG's clients could not properly assess the relevant conflicts.

*Id.* at 10–11.

Until April 2014, TRG's response to Item 14 of Form ADV remained unchanged, apart from an unrelated disclosure about "client luncheons" added in April 2013. Then, for the first time, TRG disclosed the Fidelity payment formula and rates, revealing the source and details of the conflicts of interest. Thus, there is substantial evidence to support the Commission's finding that TRG's Form ADV filings did not fully and fairly disclose the conflicts of interest arising from its payment arrangement with Fidelity "until at least April 2014." *Id.* at 8.

Likewise supported by substantial evidence are the Commission's findings that TRG and its principals failed to discharge their fiduciary duty by providing clients with copies of TRG's General Information and Disclosure Brochure (Jan. 2004) and Fidelity's Brokerage Account Client Agreement. *See id.* at 11–12. Like the Forms ADV, TRG's Disclosure Brochure failed to describe the payment arrangement with Fidelity; it contained only a general statement that when TRG referred clients to "other money managers," it received "a portion of the fees generated by the referred clients." *See id.* at 12. And it is undisputed that the relevant portion of the Fidelity Client Agreement was never received by "a large proportion of TRG's clients," *id.* at 11, because the Client Agreement was only distributed from 2005 onward. *See* Pet'rs' Br. 39–40; Reply Br. 9.

In sum, the evidence before the Commission demonstrated that TRG and its principals persistently failed to disclose known conflicts of interest arising from the payment

arrangement with Fidelity in a manner that would enable their clients to understand the source and nature of the conflicts. As the Commission emphasized, TRG and its principals had the burden under the Advisers Act of showing they provided "full and fair disclosure of all material facts," *Decision* at 7 (quoting *Capital Gains*, 375 U.S. at 194), and the evidentiary record permitted the Commission to find they did not carry this burden. Evidence that their clients suffered actual harm was not required. *See Capital Gains*, 375 U.S. at 195. TRG and its principals cannot, and do not, suggest their payment arrangement with Fidelity was not a material fact of which their clients needed to be fully and fairly informed, nor do they explain how, during the period of years at issue, that material fact was conveyed through TRG's Forms ADV or other means.

**B.**

The alternative contention put forth by TRG and its principals is that they did not violate Section 206(2) because they were not negligent. Negligence is the failure to "exercise reasonable care under all the circumstances." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 3 (2010); *see Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979). The Commission found that in view of an investment adviser's fiduciary obligation, TRG and its principals "should have known" their disclosures were inadequate. *Decision* at 12. Specifically, the Commission found, and the record supports, that the principals acknowledged the payment arrangement with Fidelity created potential conflicts of interest and that they knew of their obligation to disclose this information to their clients. *Id.* at 14; *see* ALJ Hr'g Tr. 442–43 (Feb. 10, 2015) (testimony of Robare); *id.* at 719–20, 728–29 (Feb. 11, 2015) (testimony of Jones). Nevertheless, their disclosures were "plainly inadequate," *Decision* at 8, over a period of "many years," *id.* at 12. Because a reasonable adviser with knowledge of the

conflicts would not have committed such clear, repeated breaches of its fiduciary duty, TRG and its principals acted negligently. *See id.* at 12–14.

Their counterarguments are unpersuasive. First, the suggestion that the Enforcement Division failed to establish a standard from which its disclosures deviated misses the mark. Expert testimony, as they point out, is often used to establish a professional standard of care, for example in support of an attorney malpractice claim, *see Kaempe v. Myers*, 367 F.3d 958, 966 (D.C. Cir. 2004). And it may be necessary in a securities civil enforcement action where the determination of negligence "involve[s] complex issues," *SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011), "beyond a layperson's understanding," *SEC v. Ginder*, 752 F.3d 569, 575 (2d Cir. 2014). Even with lay triers of fact, however, expert testimony is unnecessary where a professional's "lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge." *Kaempe*, 367 F.3d at 966 (quoting *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982)).

TRG and its principals maintain that the standard of care for Form ADV disclosures "is not self-evident" because, they assert, even compliance professionals may have difficulty satisfying "the evolving Form ADV disclosure requirements." Pet'rs' Br. 27. But regardless of what Form ADV requires, TRG and its principals had a fiduciary duty to fully and fairly reveal conflicts of interest to their clients. Their statutory obligation and the administrative record here show that the question whether TRG and its principals negligently breached their duty was not so complex as to require expert testimony; for a decade their disclosures simply did not refer to the payment arrangement with Fidelity, much less its terms.

15

Further, expert testimony that the disclosures they made "conformed to or exceeded the industry standards," Pet'rs' Br. 32, may be "relevant to establishing how a reasonable and prudent person would act under the circumstances," but "it is not dispositive." *Ray v. Am. Nat'l Red Cross,* 696 A.2d 399, 403 (D.C. 1997); *see Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 199 (D.C. 1991); RESTATEMENT (THIRD) OF TORTS, *supra*, § 13(a). Negligence is judged against "a standard of reasonable prudence, whether [that standard] usually is complied with or not." *Beard*, 587 A.2d at 199 (quoting *Tex. & Pac. Ry. Co. v. Behymer*, 189 U.S. 468, 470 (1903)). Even assuming the TRG principals' conduct was like that of most other investment advisers at the time would not require the Commission to find that they acted reasonably. *See, e.g.*, *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004). They have acknowledged that as investment advisers they had a fiduciary duty to disclose the payment arrangement with Fidelity to their clients, and yet the administrative record shows they resisted doing so for years.

Second, the Commission did not "violate[] its own standard of deference afforded to ALJs," Pet'rs' Br. 35. Here, TRG and its principals conflate the ALJ's credibility determinations, which the Commission accepts absent "overwhelming evidence to the contrary," *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018), and the ALJ's factual findings, which the Commission reviews *de novo*, *see Jarkesy v. SEC*, 803 F.3d 9, 12–13 (D.C. Cir. 2015); 17 C.F.R. § 201.411(a), (d). The Commission appropriately gave "significant weight" to the ALJ's credibility determinations in finding that the conduct of TRG and its principals was neither intentional nor reckless. *Decision* at 12. Because its review of the administrative record was *de novo*, however, the Commission owed the ALJ no deference on the factual question of whether Mark Robare and Jack Jones "specifically sought or received advice from [their]

consultants about how to disclose the [payment] [a]rrangement" with Fidelity, and the record showed they did not. *See id.* at 13. Furthermore, substantial evidence supports the Commission's finding that any reliance on such advice was objectively unreasonable because TRG and its principals knew of their fiduciary duty to fully and fairly disclose the potential conflicts arising from the payment arrangement with Fidelity, yet repeatedly failed to disclose the source and details of the conflicts. *See id.* at 14.

## III.

More persuasively, TRG and its principals contend that the Commission erred in ruling that they violated Section 207 of the Advisers Act by willfully omitting material information about the payment arrangement with Fidelity from TRG's Forms ADV. For purposes of Section 206, the Commission found that TRG and its principals acted negligently but not "intentionally or recklessly" by making disclosures that did not contain "the information [their clients] needed to assess the relevant conflicts of interest and did not even, at a minimum, satisfy the specific disclosure requirements of Form ADV." *Decision* at 12. For purposes of Section 207, the Commission found the same conduct to be willful. *See id.* at 15. TRG and its principals contend there is not substantial evidence to support the Commission's findings of willfulness, and we agree.

This court has yet to address the meaning of "willfully" in Section 207, but the parties agree that the standard set forth in *Wonsover v. SEC*, 205 F.3d 408, 413–15 (D.C. Cir. 2000), applies here. Pet'rs' Br. 45; Resp't's Br. 44–45. We will therefore assume (without deciding) that the *Wonsover* standard governs this case. In *Wonsover*, the petitioner challenged the Commission's definition of "willfully" in

Section 15(b)(4) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b)(4). Relying on Supreme Court and Circuit precedent, this court observed that "[i]t has been uniformly held that 'willfully' in this context means intentionally committing the act which constitutes the violation," and rejected an interpretation that "the actor [must] also be aware that he is violating one of the Rules or Acts." *Wonsover*, 205 F.3d at 414 (alterations in original).

The Commission found that Mark Robare and Jack Jones acted willfully because they "both reviewed each of the Forms ADV before filing" them with the Commission and they "were responsible" for the forms' content. *Decision* at 15. It is the Commission's position that they "acted intentionally, as opposed to involuntarily" because they "intentionally chose the language contained in the Forms ADV and intentionally filed those Forms." Resp't's Br. 45; *see SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1309–10 (S.D. Fla. 2007). In the Commission's view, neither the principals' "alleged 'good faith mindset'" nor their "subjective belief that their disclosures were proper . . . . is relevant to willfulness." Resp't's Br. 45. This misinterprets Section 207, which does not proscribe willfully *completing* or *filing* a Form ADV that turns out to contain a material omission but instead makes it unlawful "willfully *to omit* . . . any material fact" from a Form ADV. 15 U.S.C. § 80b–7 (emphasis added). The statutory text signals that the Commission had to find, based on substantial evidence, that at least one of TRG's principals subjectively intended to omit material information from TRG's Forms ADV.

"Intent and negligence are regarded as mutually exclusive grounds for liability." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 916 (D.C. Cir. 2015) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) (quoting 1 DAN B. DOBBS ET AL., THE LAW OF TORTS § 26 (1st ed. 2001))).

"Any given act may be intentional or it may be negligent, but it cannot be both." *Id.* (quoting 1 DAN B. DOBBS ET AL., THE LAW OF TORTS § 31 (2d ed. 2011)). Intent is defined as acting "with the purpose of producing" a given consequence or "knowing that the consequence is substantially certain to result." RESTATEMENT (THIRD) OF TORTS, *supra*, § 1. "Extreme recklessness" may constitute "a lesser form of intent." *Steadman*, 967 F.2d at 641–42; *see Marrie v. SEC*, 374 F.3d 1196, 1203–06 (D.C. Cir. 2004). Negligence, by contrast, means acting "without having purpose or certainty required for intent" but in a manner that is nevertheless unreasonable. DOBBS ET AL. (2d ed.), *supra*, § 31; *see* RESTATEMENT (THIRD) OF TORTS, *supra*, § 1 cmt. d.

The Commission did not find that Mark Robare or Jack Jones acted with "scienter" in failing adequately to disclose the payment arrangement with Fidelity on TRG's Forms ADV. *Decision* at 12 (defining "scienter" as "a mental state embracing intent to deceive, manipulate, or defraud" (quoting *Hochfelder*, 425 U.S. at 193 n.12)). Instead, the Commission gave "significant weight" to the ALJ's determination that their testimony and demeanor during cross-examination "belied the notion they were 'trying to defraud anyone.'" *Id.* (quoting *Initial Decision* at 39). The Commission also found that the record evidence did not "establish that [their] investment decisions on behalf of their clients were influenced by the fees they received from Fidelity." *Id.* So it did not find Mark Robare or Jack Jones "acted intentionally or recklessly," only that they "acted negligently." *Id.* Because the Commission found the repeated failures to adequately disclose conflicts of interest on TRG's Forms ADV were no more than negligent for purposes of Section 206(2), the Commission could not rely on the same failures as evidence of "willful[]" conduct for purposes of Section 207.

19

The cases on which the Commission relies do not hold otherwise. In *ZPR Investment Management, Inc. v. SEC*, 861 F.3d 1239, 1252–53, 1255 (11th Cir. 2017), the willful violation of Section 203(e) of the Advisers Act did not rest on a finding of negligence; the Commission found the adviser "acted with a high degree of scienter" by disseminating information that he knew to be false. Similarly, in *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003), the Section 207 violation was based on the Commission's finding that the advisers were, at a minimum, "reckless" in failing to disclose potential conflicts of interest in their Forms ADV. We are aware of no appellate case holding that negligent conduct can be "willful[]" within the meaning of Section 207, and we conclude that it cannot.

Accordingly, we deny the petition on the Section 206(2) violations, grant the petition on the Section 207 violations, vacate the order imposing sanctions, and remand the case for the Commission to determine the appropriate sanction for the Section 206(2) violations.