# United States Court of Appeals
## For the First Circuit

No. 24-1427

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

COMMONWEALTH EQUITY SERVICES, LLC,
d/b/a Commonwealth Financial Network,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Montecalvo, Circuit Judge,
Breyer,* Associate Justice,
and Lynch, Circuit Judge.

Thomas M. Byrne, with whom Olga Greenberg, Rebekah Whittington O'Brien, and Eversheds Sutherland (US) LLP were on brief, for appellant.

Joshua M. Feinzig, Kelly P. Dunbar, Elizabeth L. Mitchell, Joseph M. Toner, and Wilmer Cutler Pickering Hale and Dorr, LLP, on brief for Financial Services Institute, Inc., amicus curae.

Paul G. Álvarez, Senior Appellate Counsel, with whom Megan Barbero, General Counsel, Michael A. Conley, Solicitor, and Daniel Staroselsky, Assistant General Counsel, Securities and Exchange Commission, were on brief, for appellee.

---

* Hon. Stephen G. Breyer, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

April 1, 2025

**LYNCH**, **Circuit Judge**.  Commonwealth Equity Services, LLC, appeals from entry of summary judgment on liability and awards totaling roughly $93 million in a civil enforcement action brought by the Securities and Exchange Commission.  The SEC alleges Commonwealth failed to adequately disclose potential conflicts of interest from 2014 to 2018 in violation of Sections 206(2) and (4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(2), (4), and SEC Rule 206(4)-7, 17 C.F.R. § 275.206(4)-7(a), and claimed a jury trial.  On cross motions, the district court granted the SEC's motion for summary judgment as to Commonwealth's liability and denied both Commonwealth's cross-motion for summary judgment, SEC v. Commonwealth Equity Servs., LLC, No. 19-cv-11655, 2023 WL 2838691, at *1 (D. Mass. Apr. 7, 2023), and its later motion to reconsider the grant of summary judgment to the SEC, SEC v. Commonwealth Equity Servs., LLC, 718 F.Supp.3d 113, 115 (D. Mass. 2024).  The district court then entered final judgment against Commonwealth, ordering disgorgement of $65,588,906 in revenue-sharing income plus $21,185,162 in prejudgment interest and imposing on Commonwealth a civil penalty of $6,500,000.  SEC v. Commonwealth Equity Servs., LLC, No. 19-cv-11655, 2024 WL 1375970, at *1, *11-12, *13 (D. Mass. Mar. 29, 2024).  Commonwealth appeals from all of these orders.  We vacate the grant of summary judgment and the disgorgement order and remand for further proceedings consistent with this opinion.

**I.**

We recite the relevant undisputed facts of record, as well as many of the material disputed facts.

Commonwealth is an SEC-registered broker-dealer and investment advisor. Commonwealth offers its advisory services through a network of approximately 2,300 investment advisor representatives. These representatives are affiliated with Commonwealth but operate independent advisory businesses in their own names, providing advisory services and buying and selling for their clients. There are many different types of clients, as discussed below. Representatives disclose to clients their affiliation with Commonwealth.

Commonwealth representatives are responsible for identifying prospective clients, communicating with those clients about their financial circumstances and investment objectives, and managing clients' accounts in accordance with those objectives. As required by regulation, representatives agree that they will offer only those products Commonwealth has approved. Commonwealth charges clients annual advisory fees based on a percentage of the assets under Commonwealth management, and representatives receive as compensation between 50% and 98% of the advisory fees their clients pay.

To buy and sell mutual funds, these representatives utilize National Financial Services, LLC (NFS), which acts as a

clearing broker. Commonwealth functions as an "introducing firm," providing its representatives with access to NFS. In its role as clearing broker, NFS "executes and clears client trades" and NFS or one of its affiliates "maintains custody of the investments held by Commonwealth's clients." NFS provides Commonwealth, and by extension its representatives, with access to the FundsNetwork, a platform through which mutual funds may be purchased. In addition to the mutual funds available through the FundsNetwork, representatives are permitted to purchase and sell Fidelity Funds and Fidelity Advisor Funds, also through NFS.

Mutual funds that are part of the FundsNetwork are separated into three programs: the No Transaction Fee (NTF) program, the Transaction Fee (TF) program, and the Institutional No Transaction Fee (iNTF) program. The iNTF program was offered for the first time in February 2017. Mutual funds in the TF program incur fees when bought and sold, whereas those within the NTF and iNTF programs do not. As to TF funds, representatives may choose to absorb any of the transaction fees incurred when buying and selling TF program funds and choose whether to pass on those fees as part of the advisory fees they charge their clients.

Mutual funds, including those available via the FundsNetwork, may issue multiple share classes of the same fund, and many do so. Each share class of a mutual fund generally has identical voting, dividend, liquidation, and other rights and

limitations, and different classes of the same fund will receive the same income, realized and unrealized capital gains and losses, and expenses that are common to the mutual fund. But each class may have different class-based fees, expenses, or other requirements associated with it, and may be offered to different types of investors. Some of a share class's expenses are ongoing, and a share class's total ongoing expenses are referred to as its "expense ratio." Other expenses are incurred periodically, such as "transaction fees" charged when investors buy, sell, or exchange an investment. These transaction fees are not ongoing and are not included in a share class's expense ratio. Share classes may also differ in the minimum investment required to purchase a particular class. FundsNetwork provides access to more than 17,000 mutual fund share classes, and some mutual funds are offered in multiple share classes made available for purchase via FundsNetwork through more than one program (TF, NTF, or iNTF).

Mutual fund companies that offer mutual funds through the FundsNetwork platform often pay fees to NFS, though some share classes of funds are made available through the FundsNetwork platform without paying such fees. Sometimes, NFS receives payments from mutual fund companies to make some share classes of a fund available on FundsNetwork, but it is also true that other share classes of the same fund may be made available on FundsNetwork without any such payment to NFS. Neither Fidelity

Funds nor Fidelity Advisor Funds make such payments to NFS. Since at least 2009, NFS has shared a portion of these payments with Commonwealth, and, beginning in 2014, Commonwealth and NFS agreed that NFS would pay Commonwealth 80% of the gross revenue it received from funds in the NTF and TF programs.

The parties agree that representatives are not aware which share classes were part of the revenue-sharing agreement between NFS and Commonwealth. The parties also agree that representatives' compensation is not increased or decreased in any way based on whether the funds they select for their clients provide Commonwealth with revenue-sharing income.

In addition to providing representatives with access to NFS and the FundsNetwork, Commonwealth provides representatives with access to its Preferred Portfolio Services (PPS) program, a Mutual Fund Resource Guide, and a list of recommended funds. The PPS program includes model portfolios which representatives or clients may select, offered under sub-programs known as the "PPS Select" and "PPS Direct" programs. Model portfolios in the PPS Select program are developed by Commonwealth's Investment Management and Research team, while model portfolios in the PPS Direct program are created and managed by third parties and made available through Commonwealth.[1] The Mutual Fund Resource Guide

---

[1] Representatives and clients can also avail themselves of the PPS Custom program, in which case the representative would

- 7 -

provides information on mutual funds and share classes available to representatives. The list of recommended funds contains funds that have been screened by Commonwealth's Investment Management and Research team and are recommended for use by representatives when crafting their clients' portfolios. Representatives may also conduct independent research into available funds and share classes using Morningstar, a tool Commonwealth makes available to its representatives at a discounted price.

As an SEC-registered investment advisor, Commonwealth maintains a "Form ADV" brochure for its clients, and it updates this brochure annually in March of each year, as well as periodically between its annual filings. This brochure is filed with the SEC and a copy is posted on Commonwealth's website. Commonwealth also mails its clients letters summarizing any material changes made to the brochure and notifying the clients how they may obtain copies of the full brochure if they so wish.

Pertinently, SEC regulations require that this brochure:

> make full disclosure of all material conflicts of interest between [Commonwealth] and [its] clients that could affect the advisory relationship. This obligation requires that [Commonwealth] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [Commonwealth has] and the business practices in which [Commonwealth] engage[s],

---

develop a custom investment portfolio for the client and act as that portfolio's manager.

and can give informed consent to such conflicts or practices or reject them.

Amendments to Form ADV, Investment Advisers Act of 1940, Release No. 3060 (2010), 2010 WL 2957506, at *74. SEC regulations further specify that "[i]f someone who is not a client provides an economic benefit to you for providing investment advice or other advisory services to your clients, generally describe the arrangement, explain the conflicts of interest, and describe how you address the conflicts of interest." Id. at *86.

As it pertains to Commonwealth's revenue-sharing arrangement with NFS, Commonwealth's 2014 brochure provided:

> NFS offers a "No Transaction Fee" program with more than 1,200 no-load mutual funds. Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth. None of these additional payments is paid to any advisors who sell these funds.
>
> . . . .
>
> Commonwealth and your advisor may receive service fees and other compensation from investment product sponsors and distributors when they make recommendations or investment decisions for you. These fees and compensation include, but are not limited to, mutual fund and money market 12b-1 and subtransfer agent fees, mutual fund and money market management fees and administrative expenses, mutual fund transaction fees, certain deferred sales charges on previously purchased mutual funds transferred into an account, variable annuity expenses, due diligence fees, marketing reimbursements or reallowances, or other transaction or service

- 9 -

fees. Commonwealth and your advisor may receive a portion of these fees. This additional compensation presents a potential conflict of interest because Commonwealth and your advisor may have a greater incentive to recommend (or make investment decisions regarding) investments for your account that provide such additional compensation to Commonwealth or your advisor.

. . . .

Where permitted by law, Commonwealth and/or your advisor may receive transaction-based commissions, mutual fund 12b-1 fees, distributor fees, service fees, due diligence fees, marketing reimbursements, revenue sharing, or other payments relating to your investment in or otherwise supporting Commonwealth's or your advisor's activities regarding the securities and insurance products recommended, purchased, or held within your Commonwealth advisory program account. To the extent Commonwealth is the investment adviser, sponsor, or other service provider to your investment advisory program, Commonwealth receives compensation for its services. Clients should be aware that Commonwealth's or your advisor's receipt of commissions, fees, payments, and other compensation <u>may present a potential conflict of interest because Commonwealth or your advisor may have an incentive to recommend those products or programs or make investment decisions regarding investments that provide such compensation to Commonwealth or your advisor</u>.

(Emphasis added). Commonwealth made disclosures substantially similar to these in 2015 and 2016.

Commonwealth's 2017 brochure included this additional disclosure regarding its revenue-sharing arrangement with NFS:

> NFS offers an NTF program composed of no-load mutual funds. Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth. None of these additional payments is paid to any advisors who sell these funds. NTF mutual funds may be purchased within an investment advisory account at no charge to the client. Clients, however, should be aware that funds available through the NTF program may contain higher internal expenses than mutual funds that do not participate in the NTF program and <u>could present a potential conflict of interest because Commonwealth may have an incentive to recommend those products or make investment decisions regarding investments that provide such compensation to Commonwealth</u>.

(Emphasis added).

And in August 2017, Commonwealth amended its brochure to add:

> Clients . . . should be aware that funds available through the NTF program often contain higher internal expenses than mutual funds that do not participate in the NTF program. Commonwealth's receipt of a portion of the fees associated with the NTF program <u>creates a conflict of interest because Commonwealth has an incentive to make available or to recommend those products, or make investment decisions regarding investments, that provide such compensation to NFS and Commonwealth over those mutual fund sponsors that do not make such payments to NFS and Commonwealth</u>.

(Emphasis added).

In 2018, Commonwealth further modified its brochure to state that Commonwealth "will receive" revenue-sharing payments

- 11 -

from NFS, rather than that it "may receive" those payments.

Commonwealth's 2018 disclosure also stated:

> Although NTF funds do not assess transaction charges, most NTF funds have higher internal expenses than funds that do not participate in an NTF program. These higher internal fund expenses are assessed to investors who purchase or hold NTF funds. Depending upon the frequency of trading and hold periods, NTF funds may cost you more, or may cost Commonwealth or your Commonwealth advisor less, than mutual funds that assess transaction charges but have lower internal expenses. In addition, the higher internal expenses charged to clients who hold NTF funds will adversely affect the long-term performance of the client's account when compared to share classes of the same fund that assess lower internal expenses.
>
> For those Commonwealth advisory programs that assess transaction charges to clients or to Commonwealth or the advisor, <u>a conflict of interest exists because Commonwealth or your advisor have a financial incentive to recommend or select NTF funds that do not assess transaction charges but cost you more in internal expenses than funds that do assess transaction charges but cost you less in internal expenses</u>. In addition to reading this Brochure carefully, clients are urged to inquire whether lower-cost share classes are available and/or appropriate for their account in consideration of the client's expected investment holding periods, amounts invested, and anticipated trading frequency. Further information regarding fees and charges assessed by a mutual fund is available in the appropriate mutual fund prospectus.

(Emphasis added).

And in December 2018, Commonwealth amended its brochure to add the following language:

Commonwealth uses National Financial Services ("NFS") as its clearing and custody firm for substantially all of Commonwealth's PPS managed accounts. Commonwealth's business relationship with NFS provides Commonwealth considerable revenue-sharing benefits. In particular, Commonwealth receives substantial monthly revenue-sharing payments from NFS based on client assets held by Commonwealth with NFS in . . . non-Fidelity NTF funds that participate in Fidelity's NTF program, and non-Fidelity TF funds that participate in Fidelity's TF program.

Commonwealth's revenue-sharing agreement with NFS, and the existence of various fund share classes with lower-internal expenses that Commonwealth may not make available for purchase in managed account programs, present a conflict of interest between clients and Commonwealth or its advisors. A conflict of interest exists because Commonwealth and your advisor have a greater incentive to make available, recommend, or make investment decisions regarding investments that provide additional compensation to Commonwealth that cost clients more than other available share classes in the same fund that cost you less.

(Emphasis added).

From July 2014 through December 2018, NFS paid Commonwealth approximately $189.1 million, which included both revenue-sharing payments and payments for other expenses. The parties disagree as to what portion of the $189.1 million NFS paid to Commonwealth was paid pursuant to the revenue-sharing agreement. Commonwealth contends that "NFS itself had no visibility into the breakdown between revenue sharing and other payments." The SEC has estimated that approximately $155.6 million

of this was related to the advisory client assets relevant to this enforcement action. Commonwealth has not conceded the accuracy of this $155.6 million figure.

**Deposition Testimony from Commonwealth Representatives**

The SEC took depositions from six Commonwealth representatives, each of whom testified as to his own experience as a Commonwealth representative, his own decision-making process when investing on behalf of his clients, and his clients' different investment objectives. The relevant portions of their deposition testimonies in the record follow.

**Hal Michels**

Hal Michels, a registered Commonwealth representative since 2007, testified to at least two instances where, on behalf of his clients, he purchased share classes that were not the absolute lowest cost funds available.

Michels testified that his firm bought and held shares of the PIMCO Income Fund, Share Class D, from 2014 to 2017. At that time, the expense ratio for Class D was approximately 34 basis points higher than the institutional share class of the PIMCO Income Fund, and 24 basis points higher than Class P of the Fund. Michels was not aware of why his firm purchased the Class D shares for their clients instead of either the Class P or institutional shares and was not personally aware that there was a Class P or institutional share class of the Fund.

- 14 -

In 2017, PIMCO discontinued its Class D shares. Michels delegated the decision as to what to do with clients' existing Class D shares to two of his associates, Jamie Direnzo and Joe Valenza. Direnzo and Valenza decided to convert clients' Class D shares to Class P shares and not to a cheaper available fund. As Valenza explained: "[w]e are aware that the institutional share class is 10 basis points cheaper than the P share class; however, the institutional class is not considered a core fund. The P share class is a core share class. This matters more to us, so we want the P share class." Michels explained that the difference between core and non-core funds is that core funds don't pay a transaction fee on the purchase portion of a transaction.

Michels also testified that, when determining what share classes to purchase for clients, his firm's practice was "typically to start with the Commonwealth recommended list and then do [their] own research on the . . . funds that are there, as well as other funds." Direzo and Valenza "ma[de] those decisions as to which share class to use with the instructions" to select "the cheapest most effective share class available." In this context, "cheapest" meant "lowest expense ratio . . . relative to any other charges that there might be, like [transaction fees]." For classes that did not charge transaction fees, or where Michels' firm absorbed the cost of transaction fees, staff were instructed to select share classes with the lowest expense ratio. But, from 2014 to 2018,

Michels' firm purchased shares of the investor class of the American Century Equity Income Fund, rather than the institutional class of that Fund, even though the expense ratio of the institutional class was 20 basis points lower. Michels testified that he did not know why his firm had made that investment decision.

**David Bucholtz**

David Bucholtz, a registered Commonwealth representative since 2003, testified that "upwards of [75%]" of his firm's clients were invested in the PPS Custom program and "a very small percentage" were invested in PPS Select and "[m]aybe even less" in PPS Direct. When purchasing funds for clients, Bucholtz would "look and . . . try to find . . . the lower cost. Cost matters a lot." But the definition of lower cost, itself, varied in different ways. He would:

> look at how long [he was] expecting to hold this fund, if [he was] going to hold it for a long period of time, what's the expense ratio . . . [He would] try and look for a no transaction fee. If it's something [he] might be moving out of or if it's something [he] kn[e]w [was] going to be there for a long time, the transaction fee can be more significant than another one where [he was] looking to keep it for a long time.

Bucholtz testified that he purchased PIMCO Class P shares for his clients in 2016, and that when he did, he was aware that there were other PIMCO Income Fund share classes with lower expense

- 16 -

ratios, but purchased Class P because it "was the lowest expense ratio . . . without . . .[a] ticket charge on the front side for buying it."  At the time he purchased the shares he considered buying the institutional class, instead, but "wasn't certain how long [he] would be in th[e] fund" and "the expense ratio was ten basis points, so it wasn't a huge difference between the two." However, a 24 basis point difference in expense ratio between Class P and Class D shares was more than Bucholtz was willing to pay.

**William A. Muskat**

William Muskat, a registered Commonwealth representative since 2009, testified that, from 2014 to 2018, he was not "an active trading advisor" and his firm "had a buy and hold strategy." During that time, he "look[ed] for share classes that had the lower expense ratio" as "a general rule," and, at the time, "those share classes [were] typically outside of the NTF program."  During the period in which Muskat had a buy and hold strategy, he did not recall transaction fees being a factor he considered when selecting a share class.  Muskat testified that factors other than transaction fees and expense ratio might also affect the price of a share class, such as whether a fund was supplementing the fee for the expense ratio for a period of time.  Muskat also testified that the summary prospectuses for at least some funds laid out the total operating expenses for each share class in the fund and that a fund's prospectus is publicly available information.

**Richard Hana**

Richard Hana, a registered representative of Commonwealth since 2005, testified that, from 2014 to 2018, he determined what mutual funds were available through Commonwealth by consulting lists Commonwealth provided via email and by calling NFS to determine whether a particular fund could be purchased through Commonwealth. Hana was familiar with Commonwealth's Mutual Fund Resource Guide but testified that his office "use[d] Morningstar a lot for [their] research," identifying mutual funds within Morningstar that they would like to purchase for their clients, then contacting Commonwealth or NFS to determine whether those funds were available. In Spring 2018, Hana's office converted client holdings in PIMCO funds to the institutional share class of that PIMCO fund because the conversion offered "the lowest [cost] share class that [Hana's office] thought was available . . . at the time." Commonwealth then provided Hana's office with a spreadsheet listing other mutual fund share classes then held by his clients alongside proposed lower-cost share classes to which Hana's clients could convert their holdings. Hana could not recall whether his office converted any of their clients to the lower-cost share classes Commonwealth identified.

**Larry Robert Brown**

Larry Brown, a registered Commonwealth representative since August 1, 2017, testified that he never "at any time looked

for whether or not a . . . particular mutual fund[] was approved by Commonwealth," offering only the PPS Custom program to his clients. Nor did Brown ever use Commonwealth's Mutual Fund Resource Guide. Brown testified that "for new purchases since being at Commonwealth, we're only using one share class per fund family, whichever share class has the lowest expense ratio." Upon joining Commonwealth in 2017, Brown opted to absorb the cost for all of his clients' transaction fees.

In November of 2018, Brown received an announcement from Commonwealth notifying him that Commonwealth intended to begin offering only a single share class of each mutual fund and would "automatically convert existing PPS Custom and advisor-managed mutual fund holdings to the single share class on a rolling basis." Brown noted that the institutional share class of PIMCO funds (which Brown had purchased for his clients because it had the lowest expense ratio of the PIMCO funds) was not the share class that Commonwealth would be offering going forward. Brown became concerned that his clients would have their institutional share class holdings automatically converted into another share class with a higher expense ratio, and that clients would not be able to purchase institutional shares of PIMCO in the future, and reached out to Commonwealth about his concerns. Commonwealth responded, indicating that it would not convert share classes to a more expensive share class but that Brown's clients would no longer be

able to purchase the PIMCO institutional share class after April 1, 2019. Brown testified that it was his understanding that these changes did not go into effect as described, however, because he was still able to purchase the PIMCO institutional share class for his clients after April 1, 2019.

The SEC presented no testimony from any investor client of any Commonwealth representative.

## II.

The SEC initiated this enforcement action in 2019. The SEC alleged that, from July 2014 through December 2018, Commonwealth failed to adequately disclose that its revenue-sharing agreement with NFS created a conflict of interest by incentivizing Commonwealth to direct its clients' investments, through the representatives, to mutual fund share classes that produced revenue-sharing income for Commonwealth over other share classes that could be cheaper for Commonwealth's clients.[2] The SEC contended that these inadequate disclosures constituted a negligent breach of Commonwealth's fiduciary duty under Section 206(2) of the Investment Advisers Act of 1940 and that Commonwealth's failure "to adopt and to implement written policies and procedures reasonably designed to ensure that Commonwealth

---

[2] The SEC has not claimed that Commonwealth's disclosures have been deficient from the December 2018 amendment to its brochure onward.

- 20 -

identified and disclosed these conflicts of interest" violated Section 206(4) of the Advisers Act and SEC Rule 206(4)-7.

At the close of discovery, the SEC and Commonwealth each cross-moved for summary judgment with supporting expert reports. The SEC's in-house expert, Evgeny (Eugene) Orlov, described the methodologies he used to reach an estimate of the revenue Commonwealth received from December 2014 to December 2018 from its alleged violations. He treated behavior during that time period as constant and represented that he analyzed the extent to which there were alternative, lower-cost share classes available to Commonwealth's clients. Orlov estimated that, of the $189.1 million in total revenue sharing Commonwealth received from NFS, $155.6 million was "related to advisory client assets" with $61.3 million coming from NTF share classes, $77.0 million from TF share classes, and $17.3 million from iNTF share classes.

To estimate the number of share classes with lower cost alternatives, Orlov chose to analyze initially only the ten fund families in the NTF program that produced the highest revenue-sharing payments to Commonwealth. He then compared his ten fund-family sample to the lower-cost alternative share classes of those very same funds that were listed as available to Commonwealth clients. From this, he concluded that more than 80% of the revenue from those fund families came from share classes with alternatives that were less expensive for clients overall. He conducted a

similar analysis of the five highest-revenue fund families in the TF/iNTF programs and concluded that more than fifty percent of that revenue came from share classes with lower-cost alternatives.

Orlov then purported to compare what he estimated to be the revenue from these higher-cost share classes against the lesser revenue Commonwealth would have received had clients been invested in the lower-cost share classes of the same funds. Orlov extrapolated from these findings as to the fifteen fund families to the much larger group of funds available through Commonwealth as to which it had a conflict of interest.

Orlov's conclusions and methodology were contested on numerous grounds by Commonwealth experts. One Commonwealth expert, Mark E. Potter, of the firm of Crowninshield Financial Research, responded, saying that Orlov had erred in numerous ways. To start, the SEC expert extrapolated from funds which were not representative of the roughly 17,000 share classes approved by Commonwealth. Further, many of the lower-cost alternatives Orlov identified would, if clients converted their shares to those classes, result in the same or higher revenue-sharing payments to Commonwealth. Potter further opined that behavior during the period in question was not static, but "[could] change over time" based on changing "goals and objectives and situations." The revenue-sharing payments Commonwealth received decreased over time

relative to Commonwealth's total holdings,[3] and Commonwealth clients were "being placed in lower revenue sharing programs" and funds "at an increased rate over time." Potter concluded that each of these errors called into question the validity of Orlov's reliance on only the highest revenue-sharing fund families.

Potter also criticized Orlov for failing to account for the impact of transaction fees when calculating whether a lower-cost alternative to a particular share class existed. Potter explained that representatives take into account more than just a share class's expense ratio when building a client's portfolio, "also consider[ing] whether the mix of active or passive investments is a good fit for the client's goals and objectives." Potter said that "[t]ransaction fees will have a greater impact on smaller accounts, accounts that contain less liquid securities, and accounts that have more need for rebalancing or periodic withdrawals." Using the fund PIMIX as an example of the impact transaction fees would have on a representative's choice of share class, Potter observed that "[a]t a cost of $24 per trade, it would only take 3 trades" to make a fund with a higher-expense ratio

---

[3] Potter noted that the average monthly revenue went from "roughly $2.5 million in July 2014 to about $3.6 million by year-end 2018" while Commonwealth's total mutual fund holdings increased substantially more, going from "$33.7 million in 2014 to $61.8 million in 2018." Another Commonwealth expert, Alex J. Russell, of the firm Bates Group, LLC, likewise concluded that "Client Assets that did not pay revenue sharing accounted for an increasing percentage of all Client Assets" between 2014 and 2018.

more cost-effective for a client planning to actively trade. Potter cautioned that the impact of transaction fees is "not necessarily predictable and Advisors may set up their clients' portfolios to be nimble and flexible over time."

The district court granted partial summary judgment to the SEC as to Commonwealth's liability under Section 206(2).[4] The district court held that it was undisputed that Commonwealth was an investment advisor within the meaning of the Advisers Act and that it relied on the instrumentalities of interstate commerce to conduct its business, as required by the Act. The district court further held that Commonwealth's disclosures were inadequate as a matter of law. The court reasoned that this was so because over the period from 2014 to 2018 Commonwealth "present[ed] the payments [Commonwealth] receive[d] from the revenue sharing arrangement as a hypothetical rather than disclosing it as a matter of fact," "made no mention of the TF program revenue sharing or that the arrangement was limited to non-Fidelity funds," and failed to disclose that, in some cases, "class shares of the same fund

---

[4]    The district court also held that Commonwealth violated Section 206(4) of the Advisers Act and SEC Rule 206(4)-7, which requires registered investment advisors to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Advisers Act. 17 C.F.R. § 175.206(4)-7(a); 15 U.S.C. § 80b-6(4). The district court concluded that Commonwealth's lack of a written policy as to disclosure of conflicts of interest, and its inadequate disclosure of those conflicts of interest in practice, sufficed to establish its liability as a matter of law.

existed with lower internal expenses." The district court reasoned that Commonwealth's arrangement with NFS was a material fact, disclosure of which was required by the Advisers Act, because "[i]t is well-settled that potential conflicts of interest are material facts that investors would consider important in making investment decisions." (Quoting SEC v. Duncan, 19-CV-11735, 2021 WL 4197386, at *10 (D. Mass. Sept. 15, 2021)). The district court also rejected Commonwealth's argument that the fact that it was representatives who were unaware of Commonwealth's revenue-sharing arrangement who gave investment advice to clients precluded entry of summary judgment. This was because, among other things, Commonwealth's Investment Team still exercised an "advisory role" in the process by which representatives selected funds by "creating model portfolios, the Mutual Fund Recommended List, and the Mutual Fund Resource Guide."[5]

Commonwealth moved for reconsideration of the district court's summary judgment ruling, arguing that the district court committed clear errors of law in granting summary judgment to the SEC because the questions of "[w]hether Commonwealth's revenue-sharing arrangement . . . would be material to a reasonable

---

[5] The district court also determined that Commonwealth acted with the requisite negligence because "Commonwealth's revenue paying arrangement with NFS created undisclosed conflicts of interest . . . , Commonwealth made material omissions in its disclosure related to the arrangement," and so "Commonwealth was negligent in its failure to fully disclose its economic conflicts."

- 25 -

client" and whether its disclosures "provide[d] the information an advisory client would reasonably need to understand and consent to a conflict of interest" were matters for a jury. Commonwealth also argued that the issue of its negligence should have been sent to a jury. The district court denied Commonwealth's motion, determining that Commonwealth's arguments as to materiality were "the same as Commonwealth's materiality arguments on summary judgment" and that Commonwealth's argument that the SEC was not entitled to summary judgment had not also explicitly argued that the adequacy of its disclosures created a jury issue.

The SEC then moved for entry of final judgment against Commonwealth, submitting an additional expert declaration from Eugene Orlov. This additional declaration was in response to Mark Potter's earlier criticism, at summary judgment, that Orlov's report failed to account for the impact of transaction fees when Orlov purported to determine the number of accounts invested in share classes with lower cost alternatives. The additional Orlov declaration revised down Orlov's calculation of Commonwealth's estimated revenue from NTF share classes from approximately $37.3 million to $34.1 million, to a lesser total incremental revenue of approximately $65.5 million.

Commonwealth, in response, moved to introduce an additional declaration from its expert Alex J. Russell, proposing an alternate total disgorgement calculation in the amount of

approximately $25.6 million. The SEC moved to strike this declaration on the ground that it had not been disclosed during discovery and was untimely. The district court granted the SEC's motion and struck Russell's declaration, reasoning that "the new, alternative lower-cost share analysis offered by Russell in his declaration falls squarely in the category of a new theory, opinion, or methodology" that needed to be "excluded as an impermissible supplementary report." (Quoting Zeolla v. Ford Motor Co., No. 09-40106, 2013 WL 308968, at *11 (D. Mass. Jan. 24, 2014)). The district court stated that "both parties could foresee from the inception of this case that disgorgement would be a question if Commonwealth was found liable for violations of the Advisers Act" and any proposed disgorgement analysis should have been submitted earlier, at the summary judgment stage, "in rebuttal to Orlov's original report."

The district court then adopted the SEC's proposed disgorgement amount of $65,588,906. It reasoned that disgorgement in that amount, as calculated by Orlov, was appropriate because the incremental revenue Commonwealth gained was causally connected to Commonwealth's failure to disclose its conflicts of interest.[6]

---

[6] "Incremental revenue" was defined as "the difference between the revenue Commonwealth received by allowing clients to hold higher-cost NTF and TF share classes of funds and Commonwealth's revenue had clients moved their investments to the lower-cost share classes of those funds that paid less or no fees via revenue sharing to Commonwealth."

This was so, the court explained, because "Commonwealth's failure to disclose its conflicts of interest kept clients invested in higher-cost shares of Fund A rather than lower-cost shares also of Fund A" and that, "[h]ad Commonwealth's clients known that they were invested in higher-cost shares of funds for which lower-cost shares existed, and that the higher cost resulted in greater profit for Commonwealth, there is reason to believe that at least some of those clients would have elected to move their money to the lower-cost funds." The district court declined to deduct Commonwealth's expenses from the amount disgorged, reasoning that deduction of expenses was unavailable "[w]here the entirety of the disgorgement award is based on 'ill-gotten gains,'" which it found to be the case here, where the "SEC ha[d] limited its disgorgement request to incremental revenue Commonwealth received due to its failures to disclose conflicts of interest, which are, in their entirety, unlawful gain." The district court then assessed prejudgment interest in the amount of $22,191,790 and imposed a second-tier civil penalty of $6,500,000.[7] The district court denied the SEC's

---

[7] Courts may impose three tiers of penalties for violations of the Advisers Act, based on the severity of the underlying conduct. See 15 U.S.C. § 80b-9(e)(2). Second tier penalties may be imposed "if the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the penalty may be equal to "the gross amount of pecuniary gain . . . as a result of the violation." Id. at § 80b-9(e)(2)(B).

- 28 -

request that Commonwealth be permanently enjoined from violating the Advisers Act.

## III. Legal Analyses

### A. Error in Entry of Summary Judgment for SEC on Issues of Liability

Commonwealth argues that, on the facts of this case, the issue of materiality should have gone to the jury, and this requires reversal of the entry of summary judgment for the SEC.[8]

---

[8] In denying Commonwealth's motion for reconsideration arguing that materiality is to be determined by a jury, the district court stated that because Commonwealth had moved for entry of summary judgment in its favor without explicitly arguing any disputed facts should be determined by a jury, it could not "now claim that adequacy was a jury question." Commonwealth Equity Servs., 718 F.Supp.3d at 118. A party's cross-motion for summary judgment "does not constitute an agreement that if one [motion] is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial . . . ." Wiley v. Am. Greetings Corp., 762 F.2d 139, 140-41 (1st Cir. 1985) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).
Commonwealth did not need to separately argue that, if its motion was unsuccessful, disputed facts as to materiality must be sent to a jury, as this is inherent in a summary judgment analysis. If undisputed facts "support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." McGurn v. Bell Microprods., Inc., 284 F.3d 86, 93 (1st Cir. 2002) (emphasis added) (quoting Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995)); see also Sherwood v. Wash. Post, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (noting that when parties file cross-motions for summary judgment, "each side concedes that no material facts are at issue only for the purposes of its own motion" (quoting McKenzie v. Sawyer, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982))). Because the SEC demanded a jury trial in its complaint, Commonwealth did not need to do so. "Where one party has made a demand, others are entitled to rely on the demand with respect to issues covered by the demand and need not make an independent demand of their own."

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review grants of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party, here, Commonwealth. See Gibson Found., Inc. v. Norris, 88 F.4th 1, 5 (1st Cir. 2023). Commonwealth argues that the question of whether the alleged omission of certain statements was material constituted a jury issue. We agree.

"Section 206 [of the Advisers Act] imposes a fiduciary duty on investment advisors to act at all times in the best interest of . . . its investors, and includes an obligation to provide 'full and fair disclosure of all material facts' to investors and independent trustees of the fund." SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) (quoting SEC v. Cap. Gains Rsch. Bureau, 375 U.S. 180, 194 (1963)), reh'g en banc granted on other grounds, opinion withdrawn, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated in part on reh'g on other grounds, 597 F.3d 436 (1st Cir. 2010). Basic Inc. v. Levinson, 485 U.S. 224 (1988), establishes the standard for materiality, holding that the test for materiality stated in TSC Industries, Inc. v. Northway, Inc.,

---

In re N-500L Cases, 691 F.2d 15, 22 (1st Cir. 1982); see also SEC v. Jarkesy, 603 U.S. 109, 140 (2024) ("A defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator.").

426 U.S. 438, 449 (1976), was the best way to realize the "various

Securities Acts[']," Basic, 485 U.S. at 234, policy of "full

disclosure," id. (quoting Cap. Gains Rsch. Bureau, 375 U.S. at

186).  The TSC Industries materiality standard states that

> [a]n omitted fact is material if there is a
> substantial likelihood that a reasonable
> shareholder would consider it important in
> deciding how to vote . . . .  Put another way,
> there must be a substantial likelihood that
> the disclosure of the omitted fact would have
> been viewed by the reasonable investor as
> having significantly altered the "total mix"
> of information made available.

TSC Indus., 426 U.S. at 449.  The Court in TSC Industries went on

to caution that determining whether an omitted fact is material

> requires delicate assessments of the
> inferences a "reasonable shareholder" would
> draw from a given set of facts and the
> significance of those inferences to him, and
> these assessments are peculiarly ones for the
> trier of fact.  Only if the established
> omissions are "so obviously important to an
> investor, that reasonable minds cannot differ
> on the question of materiality" is the
> ultimate issue of materiality appropriately
> resolved "as a matter of law" by summary
> judgment.

Id. at 450 (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124,

1129 (4th Cir. 1970)).  Since then, this circuit has also held

that "[t]he determination of materiality is typically left to the

jury."  SEC v. Lemelson, 57 F.4th 17, 25 (1st Cir. 2023); see also

In re Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002)

("In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury . . . .").

As we explain further on, the usual rule that materiality is to be decided by the jury applies in this case. But first we deal with the district court's error of law in its holding that, as a matter of law, under a per se rule, the SEC was entitled to summary judgment as to materiality. Even the SEC does not argue to us that entry of summary judgment in its favor is justified by application of any such per se rule. It has cited no circuit case, nor have we found any, which substitutes a per se materiality rule for the summary judgment standard. The district court did not engage in the required "fact-specific inquiry" and instead rested on a generalized per se conclusion that "[i]t is indisputable that potential conflicts of interest are 'material' facts with respect to clients." Commonwealth Equity Servs., 2023 WL 2838691, at *12 (quoting Vernazza v. SEC, 327 F.3d 851, 859 (9th Cir. 2003)). The district court cited two out-of-circuit decisions which it viewed as articulating such a per se rule. See Vernazza, 327 F.3d at 859, amended, 335 F.3d 1096 (9th Cir. 2003); Robare Grp., Ltd. v. SEC, 922 F.3d 468, 472 (D.C. Cir. 2019). These cases do not alter the standard the Supreme Court and this circuit have articulated for materiality. They are also not the law of this circuit and are easily distinguishable.

*Vernazza* involved a petition for review in the courts of an SEC administrative order, entered after a hearing before an administrative law judge. *Vernazza*, 327 F.3d at 857. The petition for review dealt with issues of scienter, not whether any misrepresentations were material. See *id.* at 857-58. The district court quoted a sentence from *Vernazza* that "[i]t is indisputable that potential conflicts of interest are 'material' facts with respect to clients and the Commission." *Commonwealth Equity Servs.*, 2023 WL 2838691, at *10 (quoting *Vernazza*, 327 F.3d at 859). That sentence is itself drawn from language in *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U.S. at 180, stating that an investment advisor must "fully and fairly reveal[] his personal interests in [his] recommendations to his clients," see *Vernazza*, 327 F.3d at 859 (citing *Cap. Gains Rsch. Bureau*, 375 U.S. at 201). But the issue in *Capital Gains Research Bureau* was not about entry of summary judgment, rather that case was about the correct statutory interpretation of 15 U.S.C. § 80b-6, the Investment Advisers Act of 1940. See *Cap. Gains Rsch. Bureau*, 375 U.S. at 181 (holding that the practice of "'scalping' . . . 'operates as a fraud or deceit upon any client or prospective client' within the meaning of the [Investment Advisers] Act" (quoting 15 U.S.C. § 80b-6(2))). *Capital Gains Research Bureau* did not alter the standards for summary judgment, and both *TSC Industries* and *Basic* post-date that decision.

Robare also involved a petition for review of an SEC administrative order entered after an evidentiary hearing before an administrative law judge. Robare Grp., Ltd., 922 F.3d at 473. The district court quoted from Robare's statement that "the Securities and Exchange Commission has long held that '[f]ailure by an investment adviser to disclose potential conflicts of interest to its clients constitutes fraud within the meaning of Sections 206(1) and (2),'" id. at 472 (alteration in original); see Commonwealth Equity Servs., 2023 WL 2838691, at *12 (quoting Robare Grp., Ltd., 922 F.3d at 472). That statement from Robare cited only to an SEC release, Fundamental Portfolio Advisors, Inc., Investment Advisers Act Release No. 2146, 80 SEC Docket 1851, 2003 WL 21658248, at *15 & n.54 (Jul. 15, 2003). The quoted statement from Robare was simply an acknowledgement that undisclosed conflicts of interest fall within the statutory language of Sections 206(1) and (2) of the Advisers Act of 1940, which respectively prohibit "any device, scheme, or artifice to defraud" and "any transaction, practice, or course of business which operates as a fraud or deceit." 15 U.S.C. § 80b-6(1)-(2).

Both Vernazza and Robare are also inapplicable because of the difference in standards of review. The standards of review for grants of summary judgment are very different from the substantial evidence standard of review when the SEC seeks to enforce its orders after there have been proceedings before

administrative law judges.  See Flannery v. SEC, 810 F.3d 1, 8-9 (1st Cir. 2015).  Our review of entry of summary judgment is de novo and is not at all the same as the substantial evidence rule.  "[S]uch [substantial evidence] review is deferential."  Jarkesy, 603 U.S. at 117.  "By law, a reviewing court must treat the agency's factual findings as 'conclusive' if sufficiently supported by the record, even when they rest on evidence that could not have been admitted in federal court."  Id. (citations omitted).  That is simply not this case.

These cases on which the district court relied also predate the Supreme Court's decision in SEC v. Jarkesy, which held that the Seventh Amendment right to a jury trial applies to SEC securities enforcement actions of its administrative orders, see id. at 125, and that "every encroachment upon [the jury trial right] has been watched with great jealousy," id. at 122 (quoting Parsons v. Bedford, 28 U.S. 433, 446 (1830)).

In essence, the district court held that, in its view, since all potential conflicts are material, the omissions at issue were material as a matter of law.  Applying the correct test of materiality, we hold that a reasonable jury could conclude, on the facts of this case, that additional disclosures with more precise descriptions, added to the already-disclosed conflicts of interest, would not have so "significantly altered the 'total mix' of information made available," Basic Inc., 485 U.S. at 232

(emphasis added) (quoting TSC Indus., 426 U.S. at 449), that summary judgment was appropriate.

Commonwealth's advisory client base in 2018 was estimated to include more than 319,000 investors served by 2,300 representatives. Those investors differed in many categories of ways, including as to the types of investors, types of investments, types of investment goals they set, and what advice they received from their representatives. The SEC's motion and supporting evidence in many ways assumed that these investors were identically situated. Yet a reasonable jury could find those assumptions questionable and not substantiated. The SEC did not provide testimony from any Commonwealth clients or representatives describing the significance they attribute to the omitted information. Five of the six representatives the SEC deposed testified, either explicitly or implicitly, that the overall price of a share class was a factor they considered when determining what share class of a mutual fund to purchase for their clients, but only a factor. They also testified that they were not necessarily looking for the absolute lowest-cost share class for their clients. And it does not follow that, simply because a share class was the lowest available cost, this was significant in the materiality sense to these representatives and their clients.

Indeed, Commonwealth's capacity to indirectly influence clients toward more profitable share classes (that at times were

costly for clients) was tied to its recommendations in its Mutual Fund Resource Guide and selected portfolios in its PPS Select and Direct programs. But clients made their investment decisions through their representatives rather than Commonwealth's recommendations or pre-constructed portfolios. These representatives were themselves sophisticated and independent members of the financial industry who recommended to their clients the funds and share classes to be purchased. Four of the six representatives conducted independent research to determine what share class was best for a particular client. One representative testified that he never used Commonwealth's preconstructed portfolios or Mutual Fund Resource Guide. There is no evidence that Commonwealth limited or otherwise affected representatives' ability to research and assess the comparative cost of funds. Further, representatives looking to purchase a fund could use that fund's publicly available prospectus to compare the various share classes and find one that best suited their clients' investment strategy. Cf. SEC v. Washington Inv. Network, 475 F.3d 392, 405 (D.C. Cir. 2007) ("[T]he public availability of information is a relevant consideration when evaluating a party's disclosure obligations . . . ."). There are material issues of fact as to the importance of price, Commonwealth's influence over the funds selected, and about the significance of the allegedly deficient

disclosures, themselves. It is the role of a jury to determine those questions.

The SEC relies heavily on this court's decision in SEC v. Navellier & Associates, Inc., 108 F.4th 19 (1st Cir. 2024). It misreads the decision. This court's decision in Navellier is consistent with our result. In Navellier, we held that, on the facts there, the appellants' omissions were material as a matter of law because the omissions spoke "to the potential risk that an investor w[ould] take if they decide[d] to invest," and disclosure of the omitted information "'would obviously change the perceived' risk of investing." Id. at 37 (quoting SEC v. Bauer, 723 F.3d 758, 773 (7th Cir. 2013)). Not so here. As we said above, it is not obvious that the omitted facts from Commonwealth's conflict of interest would have changed the investors' perceptions, given their use of the investment advice of sophisticated intermediaries in the form of Commonwealth's representatives. Further, the only direct testimony in the record goes to the importance of price to a Commonwealth representative, not "how . . . clients themselves" or even the deposed representatives "considered the [conflict] at issue." Id. at 38. While we are mindful that "the SEC [is] not required to prove that any investor actually relied on [Appellants'] misrepresentations," id. at 37 (alterations in original) (quoting SEC v. World Tree Fin., LLC, 43 F.4th 448, 465 (5th Cir. 2022)), we conclude that reasonable minds could differ

on the question of materiality in this case and summary judgment is inappropriate.[9]

## B. Error as to the Disgorgement Award

Because we vacate the liability judgment, necessarily the disgorgement award must also be vacated.  Should a jury find liability in whole or in part and should the issue of disgorgement arise again on remand, the district court must consider anew whether the SEC has adequately established causal relationships between Commonwealth's profits and its alleged violations, as well as whether Commonwealth is entitled to deduct its expenses from any disgorgement awarded.  The district court made concerning, fundamental legal errors as to these issues in its prior disgorgement calculations.

"While monetary relief can be legal or equitable, money damages are the prototypical common law remedy."  Jarkesy, 603 U.S. at 123.  Disgorgement may only be ordered in an amount that is "a reasonable approximation of profits causally connected to the [underlying] violation."  Navellier, 108 F.4th at 42 (quoting SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004)).  The SEC bears the burden of showing that the amount it seeks in disgorgement is a

---

[9]     Because the district court's orders finding Commonwealth liable for violating Section 206(4) of the Advisers Act and Rule 206(4)-7 were based on substantially the same reasoning as Commonwealth's Section 206(2) liability, they also present material issues of fact that should have been sent to a jury.

reasonable approximation of the defendant's unjust enrichment. See Happ, 392 F.3d at 31. "[T]he causal connection required is between the amount by which the defendant was unjustly enriched," that is, "the amount . . . by which the defendant profited from [their] wrongdoing," and "the amount [they] can be required to disgorge." Navellier, 108 F.4th at 41, 43 (third alteration in original) (first quoting SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000); then quoting CFTC v. JBW Cap., 812 F.3d 98, 111 (1st Cir. 2016); then quoting Banner, 211 F.3d at 617). It is also clear that "enrichment, if sufficiently attenuated, no longer appears unjust." Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. f (Am. L. Inst. 2011).

On this record, the SEC has not adequately shown either reasonable approximation or causal connection sufficient to support the court's disgorgement award. The district court adopted in total the $65,588,906 sum the SEC alleged was representative of Commonwealth's profits. See Commonwealth Equity Servs., 2024 WL 1375970, at *11. The district court justified the use of the SEC's entire sum as a disgorgement award by reasoning that causation was "self-evident" because "at least some" clients would have moved money to lower-cost funds had Commonwealth more fully disclosed its conflict of interest. Id. at *7. This is not the relevant standard and it is incompatible with the requirement that disgorgement represent "a reasonable approximation" of

- 40 -

Commonwealth's unjust enrichment. Happ, 392 F.3d at 31 (quoting SEC v. First City Fin. Corp., 890 F.3d 1215, 1231 (D.C. Cir. 1989)). The district court's "at least some" standard encompasses too wide a range of possibilities. Although "a reasonable approximation" obviously need not be exact, it requires more analysis and connection than is provided to move from "a few" investors to "every" investor.

The district court must also consider and address the numerous shortcomings in the SEC's causation evidence. These include (1) the criticisms raised by Commonwealth's experts as to the representativeness of the sample Orlov used to calculate the number of lower-cost, alternative share classes; (2) countervailing evidence of causation in statements from Commonwealth representatives; and (3) the inadequately supported assumptions made by the SEC, as discussed in our analysis of materiality above.

The district court must assess whether Commonwealth is entitled to deduct any of its expenses from the disgorgement awarded. Courts awarding disgorgement "must deduct legitimate expenses before ordering disgorgement." Liu v. SEC, 591 U.S. 71, 91-92 (2020). The Supreme Court has recognized a limited exception to this rule "when the 'entire profit of a business or undertaking' results from the wrongdoing." Id. at 92 (quoting Root v. Railway Co., 105 U.S. 189, 203 (1882)). Even in such cases, courts may

- 41 -

only decline to deduct those expenses that are determined to be "inequitable," such as "unconscionable claims for personal services," id. at 84, 92 (quoting Root, 105 U.S. at 203), expenses "bought for the purposes of the [wrongful activity]," id. at 84, or "extraordinary salaries," id. (quoting Providence Rubber Co. v. Goodyear, 78 U.S. 788, 803 (1869)). This exception "requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'" Id. at 92 (quoting Goodyear, 78 U.S. at 803).

The issues we have identified with the SEC's causation evidence raise similar concerns as to whether Commonwealth's entire profit is properly attributable to its alleged wrongdoing. If the district court again concludes that the entirety of Commonwealth's profit resulted from wrongdoing, it must nevertheless then "ascertain[]" whether each of Commonwealth's claimed expenses were "legitimate," in that they had "value independent of fueling a fraudulent scheme,"[10] and were subject to deduction notwithstanding the Liu exception. See id.; see also

---

[10] On appeal, Commonwealth disputes the district court's characterization of its requested deduction for expenses, arguing that it sought a deduction in the amount of $10.8 million, not $49.5 million as the district court found. See Commonwealth, 2024 WL 1375970, at *11. Because we remand this case to the district court on the issue of liability and, should Commonwealth again be found liable for violating the Advisers Act, with instructions to ascertain which of Commonwealth's claimed expenses may legitimately be deducted, we express no opinion on this issue.

SEC v. O'Brien, No. 23-1071, 2024 WL 2813722, at *2 (2d Cir. June 3, 2024) ("Courts must 'deduct legitimate expenses' associated with the defendant's proceeds from his wrongdoing." (emphasis added) (quoting Liu, 591 U.S. at 91-92)); SEC v. Team Res. Inc., No. 22-10359, 2023 WL 1434277, at *2 (5th Cir. Feb. 1, 2023) (per curiam) ("Liu held that an order of disgorgement . . . is limited to a defendant's net profits, meaning a court must deduct legitimate business expenses when calculating the award." (second emphasis added)).

## IV.

For the reasons stated, we vacate the district court's grant of summary judgment to the SEC and the disgorgement order and remand for further proceedings consistent with this opinion. No costs are awarded.